# 23-278

# United States Court of Appeals
# for the Second Circuit

HARMEETINDER BASSI, M.D.,

*Plaintiff-Appellant,*

v.

NEW YORK MEDICAL COLLEGE, PHELPS MEMORIAL
HOSPITAL ASSOCIATION, DBA PHELPS HOSPITAL, NORTHWELL
HEALTH, INC., OPEN DOOR FAMILY MEDICAL CENTER, INC.,
d/b/a OPEN DOOR FAMILY MEDICAL GROUP
and SHANTIE HARKISOON, M.D.,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT,
SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR
## PLAINTIFF-APPELLANT

LAW OFFICES OF JOSHUA PARKHURST
*Attorneys for Plaintiff-Appellant*
11 Broadway, Suite 615
New York, New York 10004
(201) 577-2644
jparkhurst@parkhurstlawfirm.com

**<u>TABLE OF CONTENTS</u>**

*Page*

STATEMENT OF JURISDICTION..........................................................1

STATEMENT OF FACTS ...................................................................2

SUMMARY OF ARGUMENT ...............................................................17

ARGUMENT ...................................................................................19

STANDARD OF REVIEW ...................................................................19

POINT I.

THE DISTRICT COURT IMPROPERLY IGNORED OR DISCOUNTED
EVIDENCE OF DISCRIMINATION AGAINST BASSI BASED ON
RACE AND RELIGION ......................................................................22

  A. Bassi Presented Direct Evidence of Discrimination.....................22

    1. A Reasonable Fact Finder Could Infer Discrimination Through
    The Derogatory Comments About Bassi's Religious Headwear.............22

    2. Multiple Witnesses Testified To Directly Observing Differential
    Treatment of Bassi.......................................................................25

  B. The Lower Court Erroneously Discounted Bassi's Evidence of
  Pretext ......................................................................................26

    1. Appellees' Proffered Explanation Is Contradicted By Its Own
    Faculty, Residents, And Appeals Committee...........................27

      a. Rotation Evaluations.............................................................27

      b. On Call Physicians.............................................................29

      c. Clinic Evaluations.............................................................29

      d. Academic Advisor .............................................................30

i

    e.  The In Training Examination ..............................................................30

    f.  The Appeals Committee ...................................................................31

  2.  Appellees Repeatedly Violated Their Own Procedures ...........................36

    a.  Contradictory Instructions as to Use of Patient Time ......................36

    b.  Videotaping Bassi ...........................................................................37

    c.  Repeated Violations of The Residency Handbook ............................39

  3.  The Lower Court Improperly Gave Weight To The Testimony
of Interested Witnesses ..............................................................................41

POINT II.

THE DISTRICT COURT IMPROPERLY IGNORED OR
DISCOUNTED EVIDENCE OF RETALIATION AGAINST
BASSI FOR HIS COMPLAINT OF DISCRIMINATION ...................................43

  A. Appellees' Prior Adverse Actions Against Bassi Do Not Remove
the Inference Of Retaliation ...........................................................................44

  B. Bassi Presented Evidence Directly Probative Of Retaliation........................45

    1.  Direct Evidence of Retaliation ...................................................................45

    2.  Other Complaints Of Retaliation................................................................46

  C. Bassi Presented Pretext Evidence Of Retaliation.........................................48

POINT III.

THE LOWER COURT ERRED IN DISMISSING BASSI'S CLAIM
FOR BREACH OF CONTRACT AND IN DENYING BASSI
SUMMARY JUDGMENT FOR THAT CLAIM..................................................48

A. Appellees Failed To Implement The Appeals Committee's 2017 Decision ........................................................................................... 49

B. The Program Breached the Residency Contracts by Denying Appropriate Credit for Work that Bassi Successfully Performed ................ 54

C. The Program Failed to Provide Bassi with Contractually Required Notice of Non-Promotion ................................................................. 57

CONCLUSION ......................................................................................... 60

CERTIFICATE OF COMPLIANCE ........................................................ 60

## <u>TABLE OF AUTHORITIES</u>

*Page(s)*

**Cases:**

*Abdel-Raouf v Yale Univ.*,
   2015 US Dist. LEXIS 18966, D Conn. Feb. 17, 2015,
   No. 3:12CV776 (HBF) ...................................................................49

*Abuan v Level 3 Communs., Inc.*,
   353 F3d 1158 (10th Cir 2003) .......................................................33

*Adickes v. S.H. Kress & Co.*,
   398 U.S. 144 (1970).......................................................................19

*Anderson v NY City Health & Hosps. Corp.*,
   2020 US Dist LEXIS 36772 (SDNY Mar. 2, 2020,
   No. 16-CV-1051 (GBD) (KHP) ....................................................36

*Anderson v. Liberty Lobby Inc.*,
   477 U.S. 242 (1986).......................................................................19

*Barsoumian v. Univ. at Buffalo*,
   2012 U.S. Dist. LEXIS 36929, 06-CV-831S
   (W.D.N.Y. March 18, 2012)...........................................................51

*Bey v City of NY*,
   999 F3d 157 (2d Cir 2021) ............................................................19

*Carr v. St. John's Univ.*,
   17 A.D.2d 632 (2d Dep't 1962), *aff'd,* 12 N.Y.2d 802 .................55

*Chambers v. TRM Copy Centers Corp.*,
   43 F.3d 29 (2d Cir. 1994) ..............................................................21

*Chiaramonte v. Animal Med. Ctr.*,
   677 F.Appx 689 (2d. Cir, 2017) ....................................................42

*Colgan v Fisher Scientific Co.*,
   935 F2d 1407 (3d Cir 1991) ..........................................................33

iv

*Collings v Indus. Acoustics Co.*,
2001 US Dist LEXIS 11740 (SDNY Aug. 13, 2001,
99 Civ. 11875 (GEL)) ................................................................... 33

*Cronin v Aetna Life Ins. Co.*,
46 F3d 196 (2d Cir 1995) ....................................................... 21, 40

*Damon v Fleming Supermarkets of Florida, Inc.*,
196 F3d 1354 (11th Cir 1999) ...................................................... 34

*Danzer v. Norden Sys., Inc.*,
151 F.3d 50 (2d Cir. 1998) .......................................................... 19

*Easaw v St. Barnabas Hosp.*,
142 Misc. 2d 480 (Sup. Ct., Bronx County 1989) .......................... 48

*EEOC v Boeing Co.*,
577 F3d 1044 (9th Cir 2009) ........................................................ 33

*Furey v Temple Univ.*,
884 F Supp 2d 223 (ED Pa 2012) ................................................. 50

*Furnco Constr. Corp. v Waters*,
438 US 567 (1978) ...................................................................... 20

*Gomes v. Univ. of Maine Sys.*,
365 F. Supp. 2d 6 (D. Maine 2005) .............................................. 51

*Hayes v City of NY*,
2014 US Dist LEXIS 92953 (SDNY July 7, 2014) ......................... 41

*Jasco Tools v. Dana Corp.*,
574 F.3d 129 (2d Cir. 2009) ................................................... 20, 40

*Kaytor v. Elec. Boat Corp.*,
609 F.3d 537 (2d Cir. 2010) ........................................................ 20

*Lawrence v Natl. Westminster Bank,*
    98 F3d 61 (3d Cir 1996) ................................................................33

*McDonnell Douglas v. Green,*
    411 U.S. 792 (1973).................................................................20, 21, 43

*Medeiros v Pratt & Whitney Power Sys.,*
    272 F App'x 78 (2d. Cir 2008).........................................................32

*Olsson v. Bd. of Higher Educ.,*
    49 N.Y.2d 408 (1980).......................................................................49

*Papelino v Albany Coll. of Pharm. of Union Univ.,*
    633 F3d 81 (2d Cir. 2011) ...............................................................55

*Perry v Pediatric Inpatient Critical Care Servs., P.A.,*
    2022 US Dist LEXIS 172304 (WD Tex Sep. 23, 2022,
    Civil Action No. SA-18-CV-404-XR) ..........................................34

*Reeves v. Sanderson,*
    530 U.S. 133 (2000)..................................................................20, 33, 41

*Sutera v Schering Corp.,*
    73 F3d 13 (2d Cir 1995) ..................................................................21

*Swierkiewicz v Sorema N.A.,*
    534 US 506 (2002)...........................................................................21

*Vought v. Teachers Coll., Columbia Univ.,*
    127 A.D.2d 654 (2d Dep't 1987)....................................................49

**Rules, Laws & Statutes:**

28 U.S.C. §1331 ...............................................................................................1

28 U.S.C. §1343 ...............................................................................................1

28 U.S.C. §1367 ...............................................................................................1

29 U.S.C. §1291 ...............................................................................................2

42 U.S.C. §1981 ...............................................................................1, 17, 22

42 U.S.C. §1983 .............................................................................................51

42 U.S.C. §2000(e) ..........................................................................................1

New York State Human Rights Law, N.Y. Exec. Law 290 ......................1

## STATEMENT OF JURISDICTION

This is an action for race and religious discrimination, unlawful retaliation, and state common law claims brought by Plaintiff-Appellant Harmeetinder Bassi, M.D. ("Bassi" or "Dr. Bassi") against Defendants-Appellees Phelps Memorial Hospital Association ("Phelps"), Northwell Health, Inc. ("Northwell"), Shantie Harkisoon M.D. ("Harkisoon"), New York Medical College ("NYMC"), and Open Door Family Medical Center, Inc. ("Open Door"). Bassi asserted claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e et seq; 42 U.S.C. §1981; the New York State Human Rights Law, N.Y. Exec. Law 290 et seq.; and state common law for breach of contract and tortious interference with contract. The district court had subject matter jurisdiction over Bassi's claims under Title VII and 42 U.S.C. §1981 pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1343 and over Bassi's state law claims pursuant to 28 U.S.C. §1367.

Bassi filed his Complaint on August 12, 2019 and his First Amended Complaint on February 19, 2021. On June 2, 2022, Appellees moved for summary judgment, and Dr. Bassi moved for partial summary judgment on his claim for breach of contract.

On March 2, 2023, Judge Nelson S. Roman issued a memorandum order granting defendants' motions for summary judgment and denying Bassi's motion

for partial summary judgment. The Clerk of the Court entered judgment dismissing Bassi's claims with prejudice on March 2, 2023. Bassi filed his notice of appeal on March 3, 2023. This Court has jurisdiction pursuant to 29 U.S.C. §1291.

## STATEMENT OF FACTS

Dr. Bassi is a 2014 medical school graduate who was accepted into the Family Medicine Residency Program (the "Program") operated by Phelps, NYMC, and Open Door Medical Center. JA-935-936. The Program was established by an agreement between Phelps, NYMC, and Open Door. JA-89-114. In 2017 Northwell Health assumed NYMC's duties under a separate agreement. JA-935. At all relevant times, Harkisoon served as the Program Director. Upon admission into the Program, Bassi signed a residency contract dated March 25, 2014. JA-186-197. Paragraph 2 of the Contract states that services will be provided according to the provisions of the Program's Resident Handbook, which sets forth the standards for promotion and graduation, and the procedure to renew the contract. *Id.* Paragraph 11 of the contract sets forth a grievance procedure allowing residents to appeal a termination, non-renewal, or non-promotion. *Id.* The contract guarantees due process to residents. *Id.*

2

i.    Program Requirements

The Program consists of three Post Graduate Years ("PGY"), and exposes residents to a range of medical specialties, including Emergency Medicine, Cardiology, Gynecology, Dermatology, and other fields.  To graduate from the Program, a resident must complete several steps.

Each PGY, a resident works in twelve rotations with specialists in a particular field, with each rotation lasting four weeks.  JA-936.  The specialist directly supervises the resident and possesses the expertise to determine whether the resident has demonstrated competency.  JA-1066-1067, 1069-1070.  Residents must receive an average of "Satisfactory" or higher in their rotation evaluations.  JA-963-964.  If a resident fails to meet that requirement, the Program assigns the resident remedial work to demonstrate that any deficiencies were corrected to "Satisfactory" or higher in the particular rotation.  *Id.*; JA-1066-1067, 1069-1070.  Residents also spend a certain number of hours per week at Open Door's Family Medicine Clinic (the "Clinic").  JA-936.  The number of hours in the Clinic increases each PGY.

Residents are usually, though not always, supervised by "Core Faculty" while in the clinic.   Many of the Core Faculty members constitute a body known as the "Clinical Competency Committee" ("CCC"), which determines whether or not a resident should be promoted to the next PGY, and, upon completing PGY-3, whether or not the resident may graduate.  JA-936.  Residents must also perform a certain

3

number of specified medical procedures, *e.g.*, a number of live births, suture placements, etc., and work a certain number of on-call hours. JA-936-937.

Finally, residents must pass a national In-Training Examination ("ITE"), which includes a series of both practice and actual tests, with the understanding and expectation that a resident's test scores will improve over time. JA-938.

Bassi completed PGY-1 and was promoted to PGY-2. JA-938. He received another residency contract for PGY-2 applying identical terms as his PGY-1 residency contract. JA-950. While Bassi continued to receive extremely positive reviews from the specialists who supervised his rotations and the hospitalists who supervised his on-call sessions, his evaluations from Harkisoon and Core Faculty that supervised him at Open Door became particularly critical and harsh. JA 938, 1240.

Other residents and faculty observed that the Core Faculty treated Bassi differently than other residents. Core Faculty, while precepting a resident in the clinic, would briefly question the resident about the patient's condition, the resident's diagnosis, and the plan of treatment or care, assisting the resident while they went through those steps. By contrast, when Core Faculty precepted Bassi, they tried to "stump" or "grill" him. This included asking Bassi questions about the patient beyond the condition for which they were visiting the clinic, demanding that Bassi answer hypothetical questions about alternative plans of treatment or

4

prescriptions, and demanding that Bassi recite medical facts from memory, while allowing and even encouraging other residents to look up such facts in reference guides. JA-1493, 1496-1497, 1501.

Other faculty also noticed that Bassi was being treated in a different manner than other residents. JA- 1503. The chair of Phelps's Graduate Medical Education Committee ("GMEC") at the time was aware of such feedback from other faculty. JA-609. Rachna Kaul, a former faculty member who worked with Bassi during his PGY-1 year, stated that, in faculty meetings, Harkisoon would "talk down" Bassi and other residents she did not like to the other faculty so as to showcase her negative views of them. JA-1486. After leaving the Program, Kaul notified Open Door of her concerns that Harkisoon and the Core Faculty were harassing Bassi. JA-1491.

At the beginning of Bassi's PGY-2, Bassi, Kaul, and several residents attempted to meet with Richard McCarrick ("McCarrick"), the Designated Institutional Official of NYMC's oversight of the program, to discuss their concerns with the residency, including the treatment of Bassi. JA-1487, 1493, 1503. McCarrick advised the group that he would not keep their complaints anonymous and that he would inform Harkisoon, preventing the group from expressing their concerns. *Id.*

On or about January 21, 2016, Bassi was approached by Thomas Chattathil, one of two Chief Residents for the year. Chattathil advised Bassi that the Core

Faculty believed his performance was unsatisfactory and that the Core Faculty believed that Bassi looked unprofessional in his religious headwear. JA-1241.[1] Bassi and Dr. Chattathil then spoke with the other Chief Resident, Molly Kilpatrick, who confirmed that the Core Faculty had made the statements. JA-1242

The day after Bassi learned of the remarks from Chattathil, Bassi immediately went to the Human Resources Departments of both Phelps and Open Door to file complaints against the Core Faculty. JA-1242. Bassi then told Mary Rose Puthiyamadam, a member of the Core Faculty and his then academic advisor, that he had filed the complaint. *Id*. In response, Puthiyamadam told Bassi "You just made things worse for yourself." *Id.*

In a meeting with Harkisoon, the Chief Residents, and Human Resources representatives from Phelps and Open Door, Harkisoon acknowledged she had advised the Chief Residents of the comment about Bassi's patka, but did not identify who made the comments. JA-1242. When Bassi expressed concern that the Core Faculty could not directly discuss such a matter with him, Harkisoon compared the situation to advising someone of their body odor. JA-1242-1243. Although Bassi was told that he could wear his religious headwear, neither Phelps nor Open Door

---

[1] The remarks referred to a head covering known as a "patka." Bassi is a practicing Sikh, and one of the tenets of his faith is that he must wear his head covered while in public. JA-1241-1242 At most times, this consisted of a turban, with a patka underneath. *Id.* Bassi wore only his patka when he worked overnight calls (and was allowed to rest if there was not a situation requiring immediate attention), when he performed surgery, or when he delivered babies. *Id.*.

took any action against whoever made the discriminatory comments. Nor did they take any steps to confirm that those comments had not affected how Bassi had been or would be evaluated. JA-1241-1242. When Bassi followed up on his complaint one year later, Phelps advised it did not have a record of it and Open Door refused to allow him access. JA-1298-1299.

Although Harkisoon downplayed the remarks about Bassi's patka and attributed them to a member of the hospital staff, there is good reason to doubt Harkisoon's explanation. Unbeknownst to Bassi, Core Faculty had expressed their displeasure with Bassi wearing his patka as early as Bassi's PGY-1 year. Kaul averred that during Bassi's first year, Harkisoon told other faculty members she believed wearing a patka was inappropriate. JA-1485-1486. At a subsequent faculty meeting, Kaul objected to Harkisoon's comments as discriminatory, and Harkisoon responded that she did not like how Bassi looked wearing his patka and that he looked like a "thug." JA-1486. Harkisoon further stated that her remarks could not be discriminatory because she and Bassi are both of Indian ancestry. *Id.* When Dr. Kaul learned of Bassi's discrimination complaint in 2016, she contacted Open Door to advise it that Harkisoon had been singling out and harassing Bassi as early as the first year of the residency. JA-1491.

Puthiyamadam's warning that Bassi had "made things worse for himself" proved accurate, as the Core Faculty quickly escalated their discriminatory conduct

and scrutiny of Bassi. On February 16, 2016, the Program formally placed Bassi on "remediation" and threatened him with further action, including probation and termination of his residency if he did not improve his performance. JA-637, 1245-1246.

On June 17, 2016, the Program sent Bassi a "Notice of Termination," informing him that he would not be promoted to PGY-3 and that he would be terminated from the Program effective December 31, 2016 unless he satisfied stated requirements of a six-month probationary period. JA-206-207. The Program guidelines in the Resident Handbook require the Program to notify a resident of non-promotion to the next PGY no later than February 1st of the academic year. JA-962. After February 1st, a resident's promotion may be rescinded only after making a recommendation to the Program's GMEC, which makes the final determination on whether the resident should be promoted. *Id.*

Despite untimely notice, Bassi availed himself of the appeals procedure in his residency contract. Under this procedure, an Appeals Committee of three independent members of the medical staff reviews the Program's decision and renders a final decision. JA-901. On November 23, 2016, after a hearing, the Appeals Committee upheld the Program's determination to not promote Bassi to PGY-3, but rejected its termination of Bassi and the probationary requirement,

instead ruling that Bassi should be permitted to repeat PGY-2 with credit provided for work successfully completed.  JA-969.

When Bassi repeated PGY-2, he had the same clinic schedule of a PGY-2 resident, but his rotations were in the same fields as a PGY-3 resident.  JA-940.  No one asserted or advised that Bassi had not successfully completed any rotation with the exception of Gynecology 2.  *Id.*  During Bassi's 2016-2017 PGY-2, he continued to receive positive evaluations for his rotations and on call shifts.  JA-940, 1041-1059, 1247, 1310-1315, 1494.  Bassi also received the highest score of any resident in any of the three classes on the Fall 2016 ITE.  JA-1247.

Nevertheless, Bassi received increasingly negative evaluations from Harkisoon and the Core Faculty for his performance at Open Door.  *Id.*  The Core Faculty in the Clinic began to give Bassi contradictory directives concerning as to how to use his time.  JA-1248.  The Core Faculty also began to videotape Bassi with the stated purpose of reviewing the recordings with faculty so that he could improve his supposed deficient performance.  JA-1248-1249.  Bassi, however, was only allowed to view the recordings during business hours on weekdays, when he and other residents had rotation, clinic, or other assignments.  *Id.*, JA-1316.  Faculty members did not review the recordings with him, leading his former advisor Puthiyamadam to remark that she did not see the point of making the recordings.  JA-1249.

9

Indeed, Harkisoon and the Core Faculty used the recordings not to teach Bassi, but to compile a dossier of alleged deficiencies. McCarrick testified that the decision to record was made because Bassi had raised a claim of discrimination, and that the recordings were to be used to obtain a "consensus" on Bassi's poor performance. JA-1452-1453. Harkisoon later informed McCarrick that she intended to show a group of "video vignettes" to the Appeals Committee to convince them to uphold their decision to terminate Bassi's residency. JA-1452.

During his repeat PGY-2, Bassi took one of his elective rotations under the supervision of Johnny Kovoor, a family medicine practitioner, after Harkisoon asked Kovoor to "Take him off our hands." JA-1471, 1250=1251. For five days a week, Bassi worked in Kovoor's private practice performing work nearly identical to the work performed in the clinic at Open Door, and identical to the rotations Kovoor supervised at St. Joseph's residency. *Id.* Kovoor and the Program entered into an agreement setting forth the parameters of the rotation. JA-1475-1482.

Bassi spent a total of six weeks working with Dr. Kovoor and did an "outstanding job," demonstrating his medical knowledge and the ability to plan patient visits, diagnose the patient, and prescribe an appropriate plan of treatment - all skills the Core Faculty claimed he lacked. JA-1472. Kovoor advised Harkisoon of his evaluation, and recommended that Bassi be promoted to PGY-3. JA-1472, 1483. Harkisoon and the CCC refused to accept Kovoor's feedback, insisting that

Bassi had seen too many patients, even though the entire purpose of the rotation was to have Bassi see a full load of patients as a private practitioner would. JA-1472. Harkisoon and the CCC also claimed that the one-on-one supervision provided by Kovoor was not realistic in the Clinic, even though the rotation agreement approved by the Program explicitly provided for same. JA-1472-1473, 1475-1482.

In April 2017, Bassi was scheduled for two weeks of vacation. Before he left, he was told by Harkisoon that upon his return he would be immediately terminated from the Program effective May 8, 2017. This was rescinded after Bassi objected to McCarrick. JA-941. However, on June 9, 2017, Bassi received a second notice stating that he was terminated from the Program effective June 30, 2017. JA-970-972.

Bassi once again appealed the Program's decision. JA-941. The Appeals Committee conducted a hearing on July 27, 2017. *Id.* Under the Program's guidelines, the Appeals Committee must render a final decision within 30 days of the hearing. JA-968. When Bassi was awaiting the Appeals Committee's final decision, he received a call from one of its members informing him that while the Committee had made a decision, the Program was pressuring the Committee to change it. JA-942.

It was discovered during the course of this litigation that the Appeals Committee had arrived at a decision as early as August 9, 2017. The Appeals Committee's original decision was entirely in Bassi's favor and stated as follows:

> The Appeals Committee finds objective evidence to support Dr. Bassi's claim for relief. No new information was presented to warrant the committee's departure from its previous decision to reinstate Dr. Bassi. Dr. Bassi has demonstrated sufficient competency in numerous venues so as to countervail the issues which previously arose. The objective evidence supporting this decision is Dr. Bassi's score(s) on the National In Service Training Examination, which occurred following the committee's prior decision.
>
> Accordingly, the unanimous conclusions of the committee are as follows: (1) Dr. Bassi should be reinstated and allowed to complete any outstanding rotations needed to finish his training, and (2) Dr. Bassi should complete these rotations in a different environment, within the larger NYMC (New York Medical College) family, under supervision by other clinical faculty.
>
> The Appeals Committee reached this decision without determining Dr. Bassi's claim that discrimination tainted his treatment as a resident.

JA-983.

Harkisoon objected to providing the Appeals Committee's decision to Bassi until after NYMC's counsel discussed the decision *ex parte* with the Appeals Committee, claiming that NYMC could not place Bassi in another residency program, and inappropriately suggested the Committee reconsider its decision to reinstate Bassi to the Program. JA-984-985.

Following NYMC's counsel's communications the Committee modified its decision. The decision remained in Bassi's favor and mandated that he be reinstated

and allowed to complete the remaining rotations needed to finish his training. Instead of requiring that the Program allow Bassi to perform such work under another NYMC residency program, the decision stated that Bassi should complete his rotations under supervision by other clinical faculty. JA-982.

Appellees refused to comply with the Appeals Committee's decision. Instead, on August 30, 2017, Bassi received an email from Azmina Bhayani, M.D., who introduced herself as Bassi's advisor and attached a Notice of Reinstatement to the Program. JA-973. The Notice of Reinstatement provided that Bassi would be reinstated into the Program on September 11, 2017, that he would be required to repeat PGY-2 for a third time, and that he would be on a four-month probationary period. JA-975. When Bassi received the Notice of Reinstatement from Dr. Bhayani, he had not yet received the Appeals Committee's decision. JA-942.

On September 5, 2017, Bassi emailed Karen Murray, then the Chair of the GMEC, requesting a copy of the Appeals Committee's decision. JA-976. Having not heard back from Dr. Murray or receiving a copy of the Appeals Committee's decision, Bassi sent Dr. Murray a letter dated September 8, 2017 objecting to the terms of his reinstatement. JA-977-979.

Later that day, Bassi received two emails from Dr. Murray, the first of which advised Bassi that the Program would not send him a copy of the Appeals Committee's decision. JA-980. However, in her second email, Dr. Murray reversed

her position without explanation and attached a copy of the modified Appeals Committee's decision.  JA-981.

By letter dated September 13, 2017, Bassi received a reply from Dr. Murray to his September 8, 2017 letter.  JA-986.  In her September 13, 2017 letter, Dr. Murray advised that the Program would not "negotiate" Bassi's reinstatement and advised that it would reinstate Bassi in accordance with the Program's notice - rather than the terms of the Appeals Committee's decision.  *Id.*  Having since received the decision, Bassi responded by letter dated September 19, 2017, demanding that the Program reinstate him according to the decision's terms.  JA-988-989.

By letter dated September 26, 2017, Dr. Murray again responded that the Program would not negotiate his reinstatement.  JA-990-991.  Dr. Murray justified the Program's decision not to promote him on the ground that he had not amassed sufficient credit from his rotations.  *Id.*  Dr. Murray's letter included a "Record of Training," which Bassi had seen for the first time.  JA-992-998.  The Record of Training contained a table of Bassi's rotations which showed that he was denied credit for all but five rotations in the past two years of his residency.  *Id.*  This included denial of credit for five "Pass/Fail" rotations in which Bassi received a passing grade from the rotation evaluator, including evaluators serving on the Clinical Competency Committee.  JA-999-1006.  The table of Bassi's rotations also showed denial of credit for rotations where Bassi had received rankings of "Meets

Expectations" or higher in all categories. JA-1007-1009. It also contained a list of the required medical procedures performed by Bassi with handwritten notations denying credit for procedures that he had performed but were not directly observed by Core Faculty. JA-996-997.

The Program's decision to deny Bassi credit for almost all of his rotations for the past two years was neither made when he completed each rotation nor based on the rotation faculty's evaluation. Rather, in May 2017, Harkisoon and the CCC retroactively denied Bassi credit for these rotations as part of their attempt to expel Bassi from the Program. JA-1060-1061. Indeed, one member of the CCC suggested denying Bassi credit for all rotations on the basis that Bassi would leave the Program and have to start anew at another residency program. *Id.*

By letter to Dr. Murray dated October 6, 2017, Bassi advised that he would not return to the Program if the Program refused to comply with the Appeals Committee's decision and require him to again repeat PGY-2 with a four month probationary period. JA-1062-1063. In his letter, Bassi also demanded that the Program correct his transcript to reflect credit for the rotations he passed or received rankings of "Meets Expectations" or higher in all categories. *Id.*

Disregarding the Appeals Committee's decision, Murray again replied that the Program would not negotiate Bassi's reinstatement and that Bassi would be required to repeat PGY-2 in its entirety while remaining on probation. JA-1064. Bassi could

15

not return to the Program under such punitive terms, and was constructively discharged from the Program.  JA-947-948.

In the Fall of 2019, Northwell received a complaint on a hotline established for anonymous complaints.  SA-25.  The complaint was filed on behalf of three residents in the Program, who advised of "an atmosphere of manipulation, coercion, and fear of retaliation" in the Program, along with pressure to provide only positive feedback in ACGME annual surveys.  *Id.*  This echoed prior observations by residents who averred that Harkisoon denounced residents who provided negative feedback to such surveys.  JA-1493-1500.  The investigation included several interviews with residents, faculty, and staff, including one member of the Core Faculty who was so afraid of retaliation by Harkisoon that she asked if she could conduct the interview by phone so as not to be seen going to the Human Resources office.  SA-24-36.  The investigation concluded:

> There is a common theme of favoritism, fear of retaliation and the lack of comfort to bring up concerns without retribution that came through during our conversations with most of the individuals that were spoken to.  Also, Dr. Harkisoon's approach/demeanor seems to differ depending on who she is speaking with.  She lacks honesty and is often not forthcoming.

SA-32.

The Program then placed Harkisoon on a Performance Improvement Plan. SA-38-40.  The Plan identified several deficiencies in Harkisoon's performance as Program Director, including "a program culture where both residents and faculty felt

16

that questioning and dissent led to punitive actions," "a perception of favoritism from both faculty and residents," and that Harkisoon was "volatile" and "unpredictable" with residents being moved to and from "at risk" status in a manner that created "fear and uncertainty." *Id.* On October 1, 2020, Robbins Gottluck, who oversaw the Performance Improvement Plan, stated "I expressed my reservations at her being the residency director as she has not been able to change this behavior and its negative impact on the program. I expressed that the PIP needs to be closed out. And that I think it's time for a leadership change in the program." SA-50

In November of 2020, Harkisoon abruptly announced her "resignation" from the Program with no advance notice to residents. JA-1257.

## SUMMARY OF ARGUMENT

The district court dismissed Bassi's claims of discrimination and retaliation under Title VII, 42 U.S.C. §1981, and the NYSHRL, ruling that Bassi failed to present any evidence demonstrating that Appellees proffered reason for their adverse actions was a pretext for discrimination or retaliation.

This was error. Bassi opposed Appellees' summary judgment motion by submitting both direct evidence of discrimination and evidence of pretext. This included, but was not limited to, the declarations of three residents (two of which precepted him just as the Core Faculty did), two faculty members, the former Chair

of the GMEC, testimony and other statements of Appellees' own witnesses that contradicted their proffered reasons, decisions of the Appeals Committee, and the Program's own investigation which concluded that Harkisoon lacked honesty and ran the Program in an atmosphere of intimidation and retaliation. The evidence not only demonstrated that almost every other evaluator in the program rejected the Core Faculty's assessment of Bassi, but included direct observations by witnesses that Bassi was evaluated and treated worse than other residents, testimony that Harkisoon described Bassi as a "thug" in his religious headwear, and the GMEC chair's testimony that the program had violated its own procedures and he warned Harkisoon and others of the same at GMEC meetings.

The lower court downplayed this evidence and failed to address much of it altogether. In doing so, the lower court committed several errors that this Court has admonished lower courts of when evaluating summary judgment motions. The lower court disregarded all direct evidence of discrimination and focused solely on a pretext analysis. It treated each piece of evidence standing alone rather than viewing it as a whole. It repeatedly drew inferences from evidence in favor of Appellees, when a reasonable jury could choose to infer otherwise. Finally, the Court accepted the testimony and documentation of Appellees' interested witnesses as dispositive even when contradicted.

With respect to Bassi's breach of contract claim, the Court erred in failing to consider the plain language of the relevant provisions of the Faculty Handbook and the two decisions of the Appeals Committee, instead accepting Appellees contrived interpretation of same. The interpretation adopted by the lower court not only contradicts the relevant documents on their face, but ignores testimony from the doctors who served as chair of the GMEC.

## ARGUMENT

## STANDARD OF REVIEW

This Court reviews a grant of summary judgment *de novo*. *Bey v City of NY*, 999 F3d 157, 164 (2d Cir 2021). Summary judgment is only appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file...show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). The burden of demonstrating that no issue of material fact exists lies with the moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Summary judgment in an employment discrimination case may only be granted if there is a "lack of evidence in support of plaintiff's position or the evidence [is] so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 54 (2d Cir. 1998). The court

must review the entire record as a whole, not only isolated facts standing alone, and must "draw all reasonable inferences in favor of the nonmoving party," *Reeves v. Sanderso*n, 530 U,S. 133, 150 (2000), "even though contrary inferences might reasonably be drawn*," Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, (2d Cir. 2010) (*citing Jasco Tools v. Dana Corp.*, 574 F.3d 129, 152 (2d Cir. 2009).

In considering a summary judgment motion, the court "must disregard all evidence favorable to the moving party that the jury is not required to believe," *Reeves*, 530 U.S. at 151. A court may only grant summary judgment based on a moving party's evidence which is uncontradicted, unimpeached, and comes from disinterested witnesses. *Id.*

The lower court analyzed Bassi's discrimination and retaliation claims solely through the framework of *McDonnell Douglas v. Green*, 411 U.S. 792 (1973) and its progeny. Although courts often view discrimination cases through this framework, the Supreme Court has admonished that it "was never intended to be rigid, mechanized, or ritualistic" in its application to every case. *Furnco Constr. Corp. v Waters*, 438 US 567, 577 (1978). In many cases, including this one, plaintiffs have other evidence of discrimination that is probative independent of the employer's proffered nondiscriminatory reason for its actions. Proving pretext is but one method of proof, and not necessarily used in every case. "For instance, if a plaintiff is able to produce direct evidence of discrimination, he may prevail without

proving all the elements of a prima facie case." *Swierkiewicz v Sorema N.A.*, 534 US 506, 511 (2002)

This Court has distinguished between a defendants' burden of production pursuant to the second "step" of the *McDonnell-Douglas* analysis and a defendant's burden of persuasion to receive summary judgment or judgment as a matter of law. Thus, "unless the employer has come forward with evidence of a dispositive nondiscriminatory reason as to which there is no genuine issue and which no rational trier of fact could reject, the conflict between the plaintiff's evidence establishing a prima facie case and the employer's evidence of a nondiscriminatory reason reflects a question of fact to be resolved by the factfinder after trial." *Cronin v Aetna Life Ins. Co.*, 46 F3d 196, 203 (2d Cir 1995) *citing Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29 (2d Cir. 1994). Furthermore, this Court has repeatedly held that "the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors." *Sutera v Schering Corp.,* 73 F3d 13, 17 (2d Cir 1995); *Cronin*, 46 F.3d at 203.

**POINT I.**

**THE DISTRICT COURT IMPROPERLY IGNORED OR
DISCOUNTED EVIDENCE OF DISCRIMINATION
AGAINST BASSI BASED ON RACE AND RELIGION.**

The lower court dismissed Bassi's claims for discrimination based on religion and race under Title VII, 42 U.S.C. §1981, and the New York State Human Rights Law, holding that Bassi failed to present any evidence of discrimination. This was error, as Bassi presented both direct evidence of discrimination and evidence of pretext.

**A.      Bassi Presented Direct Evidence of Discrimination**

Dr. Bassi did not just contradict and impeach the proffered reasons for refusing to promote him and repeatedly trying to terminate his residency. Certain evidence was probative of discriminatory conduct by Appellees independent of the reasons they offered for their actions against Bassi. The lower court, in analyzing Bassi's claims, disregarded this evidence and focused solely on whether Bassi had demonstrated pretext.

**1.      A Reasonable Fact Finder Could Infer Discrimination Through The
Derogatory Comments About Bassi's Religious Headwear.**

Bassi presented evidence that the Core Faculty discriminated against him because he wore religious headwear (specifically his patka). The lower court acknowledged faculty comments about the patka in its recitation of the facts, but

22

disregarded them entirely in the context of addressing Bassi's claims of discrimination.

Bassi first learned of the comments in January of 2016. At that time, he was approached by Chief Resident Chattahill and specifically told that it was the Core Faculty who believed his patka was unprofessional, and did so in the context of advising him the Core Faculty disapproved of his performance in the program. JA-1241. These comments were confirmed by the other Chief Resident, Molly Kirkpatrick, who tearfully apologized to Bassi for not standing up for him in the face of such a blatantly discriminatory comment. JA-1242. Appellees downplayed this, claiming the comment was made by a hospital faculty member to Harkisoon, and that Harkisoon just relayed the comment to Bassi through Chattahil so he was aware. A reasonable fact finder could easily reject Harkisoon's explanation. Appellees did not submit the declaration of the individual who they claimed made the comment, and instead relied on Harkisoon, an interested witness. Chattahil specifically informed Bassi it was the core faculty who believed he looked unprofessional in the same conversation where they expressed displeasure with his performance. Kilpatrick confirmed Dr. Chattahil's version.

Harkisoon was contradicted by other faculty members. Puthiyamadam contradicted Harkisoon's account that the comment was limited to one hospital faculty member, and testified that "some of the specialists" and more generally

23

"some people" had mentioned Bassi's patka. JA-1422. Even stronger evidence came from Kaul, who averred that Harkisoon had been complaining about Bassi's patka as early as his PGY-1 year. When Kaul confronted Harkisoon about such comments, Harkisoon confirmed she believed the patka was inappropriate and specifically said Bassi looked like a "thug" when he wore it. Harkisoon further made the bizarre comment that her remarks could not be considered discriminatory because both she and Bassi are of Indian descent. JA-1486

A reasonable jury could reject Harkisoon's version of the comments as self-serving, uncorroborated by the individual who made the comment, and contradicted by other witnessess. Harkisoon's comments and hostility towards Bassi's religious wear are evidence of bias that came not from a one-time remark but was repeated over time, repeated by Core Faculty to Kaul, and directly related to Harkisoon and the Core Faculty's perceptions of Bassi's competency and professionalism. A jury could believe those witnesses over Harkisoon. The derogatory comments about Bassi's headwear can, either by themselves or viewed with other evidence, be considered probative of Bassi's claim that Harkisoon and the Core Faculty discriminated against Bassi on the basis of his religion and race.

**2.     Multiple Witnesses Testified To Directly Observing Differential Treatment of Bassi.**

The court below dismissed the declarations of three residents who directly witnessed Bassi being treated worse than other residents. The lower court viewed this evidence solely through the lens of pretext and discarded it. Specifically the Court found that while the evidence showed Bassi had the respect of his peers, it did not contradict Appelees' own perception of poor performance. The three residents did not simply testify, however, that they thought Bassi performed well, but that they directly observed Bassi being treated differently than any other resident. Their testimony included the following:

- In the Open Door clinic, Core Faculty questioned Bassi more aggressively than other residents. For all other residents, precepting entailed asking the resident to present the patient, then asking the resident for a diagnosis and plan of treatment. When precepting Bassi, Core Faculty tried to "stump" or "grill" Bassi, and would continue to ask questions until they could get Bassi to give a wrong answer. JA 1492-1493, 1496-1497, 1501.

- Core Faculty encouraged other residents to look up relevant medical information and advised them where to find such information. These residents were praised in their evaluations for doing so. The same faculty demanded that Bassi recite medical information from memory and admonished him if he did not do so. JA-1407, 1501, SA-4.

- The program held Bassi to a strict timeframe for the completion of medical notes, while excusing other residents. This was so even though Bassi often completed his notes earlier than other residents, and Core Faculty admitted they did not know if Bassi turned in his notes later than other residents. JA-1501, JA-1428, 1437. In fact, Bassi often turned in notes more promptly than other residents or faculty. JA-1250, 1318-1319.

- The program required that Bassi complete all learning modules, while excusing other residents from doing so. JA-1497-1498.

- The Program denied Bassi credit for procedures that he had performed but were not observed by the Core Faculty. JA-996-997. No other resident was subjected to this requirement. JA-1498, 1503.

Evidence of differential treatment was not limited to other residents. Other faculty members told resident Zaks and GMEC Chair Strongwater that they did not understand why Bassi was being treated so harshly by the Core Faculty. JA-1068, 1503. Kaul also averred that she noticed such discriminatory treatment as early as Bassi's PGY-1 year. JA-1491.

The above evidence includes testimony from witnesses who directly a) witnessed derogatory comments about Bassi's religious headwear, and b) witnessed that Bassi was treated worse than his similarly situated peers. A reasonable jury could rely on such evidence to determine that Appellees discriminated against Bassi based on his religion and/or race independent of any proffered nondiscriminatory reason.

## B. The Lower Court Erroneously Discounted Bassi's Evidence of Pretext

Bassi submitted declarations of six disinterested witnesses that contradicted material allegations made by Appellees in support of their motion. Bassi also submitted exhibits and deposition testimony of defendant's own Core Faculty members that contradicted Appellees' proffered non-discriminatory reason. This

26

included objective performance metrics, investigation notes and a report from the
Program's investigators which concluded that Harkisoon lacked credibility. It also
included the decision of the Appeals Committee which explicitly rejected the
CCC's findings that Bassi had not demonstrated the proficiency and competency to
advance to PGY-3.

The lower court proceeded to review some of this evidence in a piecemeal
manner, and discarded it on an individual basis by crediting Appellees' own self-
serving descriptions of their motivations and their strained interpretations of
documentary evidence. As discussed below, the lower court's refusal to accept
this evidence as probative, both individually and as a whole, was error.

**1.     Appellees' Proffered Explanation Is Contradicted By Its Own Faculty,
Residents, And Appeals Committee.**

Appellees claim that Bassi failed to perform sufficiently to continue in the
program is contradicted by numerous sources, including other faculty, attending
physicians, fellow residents, and the Appeals Committee which twice overruled the
Core Faculty's decisions to terminate Bassi from the Program.

**a. Rotation Evaluations**

Bassi received outstanding reviews from his rotation faculty. JA-999-1059.
He was found to have met the relevant milestones and competencies in each rotation,
with the exception of an "incomplete" in a Gynecology Rotation because he was

27

scheduled to work "on call" which prevented him from attending the requisite number of sessions. JA-938. Appellees downplay this record, claiming that rotations do not entail independently seeing and treating patients. This is incorrect. Bassi's rotation advisors explicitly praised Bassi's performance, and praised his ability to see patients independently. JA-1313, 1472, 1483. Residents also spend significantly more time in rotations than they do in the Clinic. JA-1240-1241, 1285-1287.

Perhaps the most blatant example of the Program disregarding positive feedback was its wholesale dismissal of the evaluation of Dr. Kovoor. Kovoor, pursuant to an agreement with the Program, supervised Bassi in his office where he treated a full load of patients and performed work that was identical to the work he performed in Open Door's clinic. JA-1471-1472. Kovoor has supervised other family medicine residents in this same rotation. *Id.*. Kovoor advised the Program that Bassi had performed well, met all the necessary competencies, and ought to be promoted to PGY-3. JA-1483. Despite that, the Program refused to accept Dr. Kovoor's evaluation. Among other things, the Program stated that Bassi had seen too <u>many</u> patients, although they had previously criticized Bassi for seeing too <u>few</u> patients. JA-1251, 1472. The Program also claimed that the rotation was of no value because it was conducted under one-on-one supervision. *Id.* However, the written agreement between the Program and Kovoor explicitly provided for one-on-one

supervision.  JA-1481.  The decision to disregard Kovoor's evaluation is not a surprise, because Harkisoon had originally told Kovoor that she wanted him "Take him off our hands," rather than for any bona-fide educational purpose.  JA-1471.

**b.  On Call Physicians**

The hospitalists and attending physicians who supervised Bassi while he was on call similarly praised Bassi, not only for his specific work, but in comparison to other residents.  Dr. Smith told Harkisoon that Bassi was one of the stronger residents he had worked with.  JA-1266.  Dr. Soloveich informed Harkisoon that "Dr. Bassi is easily one of the best residents in the program (not just his PGY)."  JA-1265.  Feedback provided by these hospitalists included instances where Bassi's work saved patients' lives in emergency situations.  JA-760, 1264.  The Core Faculty tried to downplay this but also admitted that they could not recall any other instance where they were advised that one of their residents had saved as patient's life.  JA-1409.

**c.  Clinic Evaluations**

Outside the Core Faculty, Bassi received positive evaluations from preceptors in the clinic at Open Door.  Bassi was precepted by senior residents, including Jessica Zaks and Heidi Mandry, who confirmed that Bassi demonstrated the ability to perform safe and independent patient care in the clinic.  JA-1494-1501.

### d. Academic Advisor

Bassi's academic advisor for much of his time in the Program was Mary Rose Puthiyamadam. Puthiyamadam, by admission, never ranked Bassi below "good" when she directly precepted him. JA-1426. Although Puthiyamadam tried to explain this by claiming that she did not want to hurt Bassi's feelings or discourage him, a jury could take her evaluations at face value and reject her later explanation.

### e. The In Training Examination

When Bassi took the National In-Training Examination in October 2016, the start of his repeat PGY-2, he scored higher than any other resident in the Program at the time in any year. JA-1247. Appellees again attempt to brush off the objective evidence of meeting required competencies, claiming that the exam is simply a form of book learning and does not reflect a resident's ability. This is incorrect. Appellees repeatedly claimed that Bassi did not have sufficient medical knowledge to practice, the ITE is a test of medical knowledge, and the Program requires residents to pass the exam to complete the program. Moreover, Appellees required Bassi to obtain a satisfactory score as part of their own probation plan, yet disregarded it when he met the requirement. JA-674.

**f.  The Appeals Committee**

Appellees' assessment of Bassi's performance was rejected by the very body that they appointed to review the Core Faculty's determination, the Appeals Committee.   The Appeals Committee held that "Dr. Bassi has demonstrated sufficient competency in numerous venues so as to counterveil the issues which previously arose."  JA-982-983.  The Appeals Committee was so concerned about the Core Faculty's ability to make a fair assessment of Bassi that they insisted that he complete the residency under different supervision.  *Id.*

The lower court offered its own interpretation of the Appeals Committee decision (which is contradicted later in its own opinion) claiming that it did not reject the judgment of the Core Faculty, and that the 2017 Appeals Committee decision "did not back down from its prior findings" in 2016 that Dr. Bassi  failed to meet the required competencies to advance in the program.   JA-1558. It reached that conclusion by focusing on one sentence fragment, the portion of the decision which said it found "[n]o new information [to] warrant…departure from its prior ruling…" That citation, however, omits the remainder of the sentence which specified that it was referring to its prior ruling "to reinstate Dr. Bassi."  JA 982-983.

The lower court's interpretation is also contradicted by the surrounding sentences in the 2017 decision.  While the 2016 decision explicitly "upholds the June

31

17, 2016 decision of the Clinical Competency Committee denying the promotion of Dr. Harmeetinder Bassi to the PGY 3 year" the 2017 decision "finds objective evidence to support Dr. Bassi's claim for relief." The 2016 decision justified not promoting Bassi because its review "did reveal deficiencies in Dr. Bassi's PGY-2 performance." By contrast, the 2017 decision confirmed that one year later "Dr. Bassi has demonstrated sufficient competency in numerous venues so as to countervail the issues which previously arose." The 2017 decision explicitly contrasts its findings with the 2016 decision as it related to Bassi's competency to advance. *Compare* JA-969 *with* JA-982-983.

The district court chose to disregard all the above evidence in support of Bassi's claims, claiming all that it showed was that Dr. Bassi had obtained the respect of his peers, other faculty, and performed well on a particular test. This was error for multiple reasons. First, as this Court and district courts have recognized, when an employer proffers poor performance as its reason for the adverse employment action, testimony from either co-workers or supervisors as to the employee's strong job performance can be used to demonstrate pretext. In *Medeiros v Pratt & Whitney Power Sys.*, 272 F App'x 78 (2d. Cir 2008), this Court reversed the lower court's grant of summary judgment to an employer who claimed it terminated the plaintiff for poor performance. This court held it was error for the lower court to exclude evidence from a prior supervisor (who had since left the

company) who averred that plaintiff was, in fact, one of the workplace's stronger performers. This Court, following the Supreme Court's guidance in *Reeves* recognized "…a reasonable jury could nonetheless view the Avram affidavit as circumstantial evidence undermining the credibility of Maus's evaluation of Medeiros and his peers, thus serving as evidence of pretext." 278 F.App'x at 80-81 *citing Reeves*, 520 U.S. at 147, 149. *See also Collings v Indus. Acoustics Co.*, 2001 US Dist LEXIS 11740, at *12, n 4 (SDNY Aug. 13, 2001, 99 Civ. 11875 (GEL)) ("Testimony from others that could undermine the foundation and credibility of the evaluation can persuade a factfinder to reject the decisionmaker's account of his reasons for acting."). Other circuit courts have also recognized that co-workers or other supervisors testifying about an employee's strong performance can serve as evidence of pretext. *Colgan v Fisher Scientific Co.,* 935 F2d 1407, 1422 (3d Cir 1991) (holding it error for district court to reject co-worker testimony disputing employer's proffered reason of poor performance); *Lawrence v Natl. Westminster Bank*, 98 F3d 61, 67 (3d Cir 1996) (testimony of plaintiff's subordinates was probative of pretext); *EEOC v Boeing Co.*, 577 F3d 1044, 1051 (9th Cir 2009) ("specific positive evaluations of Castron's performance, both by her coworkers and by other managers, critically undermine the credibility of her official evaluation in a manner relevant to determining the existence of pretext."); *Abuan v Level 3 Communs., Inc.*, 353 F3d 1158, 1174 (10th Cir 2003) (co-workers positive

assessment of work "clearly probative of pretext"); *Damon v Fleming Supermarkets of Florida, Inc.*, 196 F3d 1354, 1364 (11th Cir 1999) (co-manager's testimony contradicting employer's claim that Bassi's stores were disorganized is probative of pretext). *See also Perry v Pediatric Inpatient Critical Care Servs., P.A.,* 2022 US Dist LEXIS 172304, at *18-19 [WD Tex Sep. 23, 2022, Civil Action No. SA-18-CV-404-XR]) ("It is well-established that statements from coworkers detailing personal observations that contradict the employer's stated reason are competent pretext evidence.").

Second, as explained in Point I.A.2 *supra*, the evidence submitted by Bassi did not simply demonstrate that he had performed well, it demonstrated that Appellees had treated him worse than his peers. Bassi's three co-residents (one from each year of his residency) all testified that they observed the core faculty treated Bassi more harshly when they precepted Bassi. Similarly, other faculty, including the GMEC Chair Strongwater and Kaul, observed that Bassi had been treated worse than other residents. Kaul advised Open Door that Harkisoon had been harassing Bassi out as early as the first year of residency.

With respect to Kovoor's declarations, he did not simply state that Bassi had performed well. Rather, the Program specifically asked him to assist Bassi, and Kovoor and the Program designed an off-site rotation for doing so. Kovoor has supervised other family medicine residents in this same rotation. JA-1471. Yet

when Kovoor advised the Program that Bassi had performed well, met all the necessary competencies, and ought to be promoted to PGY-3, the Program refused to accept Kovoor's evaluation, claiming that the rotation was of no value because it was conducted under one-on-one supervision.  JA-1472-1473, 1251.  Yet the written agreement between the Program and Kovoor explicitly provided for one-on-one supervision.  Kovoor's declarations demonstrated not simply that Bassi had received the respect of other faculty, but that Harkisoon and the CCC chose to disregard relevant feedback from any source that contradicted their own, even when they approved the rotation to provide such feedback.

In this case, the evaluations by every source other than the Core Faculty cannot, on a motion for summary judgment, be disregarded as an honest and good faith difference of opinion.  When assessing a resident and determining his or her standing in the Program, the CCC must prepare and review a "summative evaluation" which takes feedback from all sources, including rotation faculty, on call evaluations, and any other source.  JA-1416.  Yet Harkisoon and the CCC, in making their evaluation, disregarded this requirement and disregarded the overwhelming contradictory evidence presented to them.  Under such circumstances, a reasonable fact finder is permitted to reject an employer's explanation and infer discrimination.

## 2. Appellees Repeatedly Violated Their Own Procedures.

An employer's failure to follow its own employment policies can be used as evidence of pretext. *Anderson v NY City Health & Hosps. Corp.*, 2020 US Dist LEXIS 36772, at *45 (SDNY Mar. 2, 2020, No. 16-CV-1051 (GBD) (KHP)). In this case, the record demonstrates that Appellees repeatedly disregarded Program requirements and standards in supervising and evaluating Bassi.

### a. Contradictory Instructions as to Use of Patient Time.

One of Appellees' criticisms of Bassi's performance was that he was unable to safely see a sufficient number of patients in the Clinic, and that the faculty had to take more time to supervise and guide him. As a result, during Bassi's PGY-2 year, his schedule was reduced to seeing the number of patients that a PGY-1 would see, with one patient being scheduled per hour. JA-1248. The various Core Faculty gave Bassi contradicting instructions as to how to use his hour. Some members told Bassi that because he had a full hour, he should use it to continue questioning the patient and learn more information. *Id.* Others told him that if he completed the encounter before the hour was complete, he could see more patients. *Id.* Yet other members told Bassi that once he completed the patient visit, he should take the rest of the time to complete medical notes and other documentation, even though both

36

Program rules and his probation plan required notes to be completed within 24 hours. JA-1368.

The lower court disregarded this evidence, finding all that it showed is that the Core Faculty had taken an interest in Bassis' education, disregarding that the instructions were contradictory so that it was held against Bassi when he tried to follow one set of instructions at the expense of another. JA-1368. The Court's inference in favor of Appellees is also contradicted by evidence which shows that the Core Faculty had already determined to terminate Bassi's residency. Kaul testified that one core faculty member admitted as early as Bassi's first PGY-2 year that the program was trying to "get rid of" Bassi. JA-1486-1487. Kovoor testified that when Appellees asked Kovoor to supervise a rotation with Bassi, Harkisoon asked him to "take him off our hands." JA-1471.

**b. Videotaping Bassi**

All residents have some patient encounters videotaped to be reviewed with the Program's behavioral health specialist. Starting in Bassi's repeat PGY-2 year, however, the Core Faculty began to record him more frequently. JA-1248-1249. This was purportedly done to assist Bassi and help him improve. A reasonable jury, however, could conclude otherwise.

Bassi was unable to review the recordings, as they were only available during weekdays from 8 to 5, when he and other residents had other assignments or work to perform.  JA-1249, 1316. In addition, faculty members never reviewed the tapes with him.  JA-1249.  Bassi's prior academic advisor and Core Faculty member Puthiyamadam admitted that there was no point to recording Bassi if the faculty were not reviewing the recordings with them.  *Id.*

In fact, there was a point to the recordings, but it was not to help Bassi. NYMC's designated institutional officer testified that the Program began taping Bassi because once he made a complaint of discrimination, recordings could be used as evidence of a "consensus" of Bassi's deficiencies.  JA-1452-1453.  Yet Appellees submitted no evidence that the recordings were reviewed in response to Bassi's discrimination complaint or as part of any investigation to determine whether discrimination was the reason the Core Faculty's assessment was contradicted by nearly every other source in the program.  NYMC conducted no investigation into Bassi's claim of discrimination, Open Door refused to provide Bassi with any records of its supposed investigation, and Phelps and Northwell did not even have records of Bassi's complaint.  JA-1243, 1298-1299.  In addition, Harkisoon advised McCarrick that she wanted to use the recordings as "video vignettes" against Bassi in front of the Appeals Committee.  JA-1452-1453.  A reasonable jury could determine that videotaping Bassi was not designed to help his performance, or to

reach an objective consensus concerning his performance, but instead to create a dossier against Bassi.

**c.    Repeated Violations of The Residency Handbook.**

As is addressed in further detail in Point III infra. the Program violated the provisions of its own Resident Handbook in its repeated attempts to terminate Bassi. The Program tried to terminate Bassi on three separate occasions without the required notice of termination, including one occasion where Harkisoon brazenly told Bassi that he was to leave the program the moment he returned from vacation in April 2017, a decision that was only reversed when Bassi complained to McCarrick.  The Chair of the GMEC for Phelps stated that the Program did not follow the appropriate procedures for its decision not to promote Bassi, and repeatedly raised at GMEC meetings that he was concerned whether the Program had appropriate due process protections in place.  JA-656-657, 662-663, 1070-1071.

The Program violated its guidelines for the completion of rotations, retroactively denying credit for almost all rotations that Bassi successfully passed, in May 2017.  JA-944-946, 992-1061.  The Program also imposed a requirement specifically for Bassi that certain procedures had to be observed by the Core Faculty in order to be considered complete.  JA-996-997.

Finally, the Program refused to implement the decision of its Appeals Committee, which held that Bassi had met the required competencies, and should be allowed to complete his residency by finishing his remaining rotations under supervision by different clinical faculty. Instead, the Program demanded that Bassi repeat PGY-2 a third time, and imposed a four month probationary period, a requirement the Appeals Committee rejected even back in 2016 when it upheld the first decision not to promote Bassi.

The lower Court erred in when it consistently accepted Appellees' explanations as to why their actions were innocuous rather than discriminatory. It erred by disregarding Bassi's evidence or treating in a piecemeal manner, as if each piece of evidence was the sole submission by Bassi, and proceeded to draw an inference in the most favorable manner to Appellees. *Cronin* 46 F3d 196, 203 (improper to grant summary judgment if any evidence allows an inference in favor of non-moving party); *Jasco Tools, Inc. v Dana Corp. (In re Dana Corp.)*, 574 F3d 129, 152 (2d Cir 2009) (holding court erred by viewing each piece of plaintiff's evidence piecemeal and "giving credence to innocent explanations for individual strands of evidence.").

A reasonable jury could choose to accept Appellees' explanations as to why they treated Bassi inconsistent with the Program's procedures and disregarded every source of feedback that contradicted the Core Faculty. But a reasonable jury could

also reject the Appellees' self-serving explanation as to such inconsistencies and find that they were a pretext for unlawful discrimination.

### 3. The Lower Court Improperly Gave Weight To The Testimony of Interested Witnesses.

The record submitted by the Appellees consists almost entirely of testimony by Harkisoon and the Core Faculty members who constituted the CCC, or the evaluations they prepared. These are the individuals whose decision making is at issue in this case. When a party moves for judgment as a matter of law, whether on summary judgment or after a trial, a court must disregard the testimony and evidence that comes from interested witnesses. *Reeves,* 530 U.S. at 151, *Hayes v City of NY,* 2014 US Dist LEXIS 92953, at *16 (SDNY July 7, 2014) ("the testimony of interested witnesses that support the movant cannot be considered on a summary judgment motion").

The lower court, in a footnote, stated that it was not relying on the testimony of Harkisoon and the Core Faculty. However, the only evidence submitted by Appelleees were the evaluations, records, and notices that were prepared almost exclusively by them. That these evaluations were submitted through an attorney declaration does not change the fact that Appellees' proffered reasons for their adverse actions were only offered through self-serving statements, whether deposition testimony or documents they prepared.

The court also held it could rely on the testimony of interested witnesses, citing an unpublished decision by this Court, *Chiaramonte v. Animal Med. Ctr.*, 677 F.Appx 689 (2d. Cir, 2017), allowing such evidence when "uncontradicted and unimpeached." *Id.* at 693. *Chiaramonte* was an Equal Pay Act case which concerned the comparable nature of job duties performed by male and female workers, and did not rely on assessing the credibility or veracity of the employers' reasons for its actions. Indeed this Court in *Chiaramonte* reaffirmed that interested witnesses testimony cannot be used to grant summary judgment when it is the province of the jury to "weigh evidence, make credibility determinations, and draw factual inferences." *Id.*

In this case, Bassi submitted evidence from three residents, two faculty members, the former chair of the GMEC, objective indicators of strong performance such as Bassi's ITE score, and the Program's own Appeals Committee. In addition, Phelps itself impeached Harkisoon as a credible witness. The 2019 investigation in response to complaints of her retaliation and intimidation against both residents and faculty concluded that Harkisoon "lacks honesty and is often not forthcoming." Given that Phelps has explicitly said that their Program Director lacks credibility, a reasonable jury could reach the same conclusion.

In addition to contradicting the credibility of the evaluations made by Harkisoon and the Core Faculty, Bassi submitted evidence demonstrating that

Harkisoon's sworn testimony was false. Harkisoon averred that Kaul had "grave concerns" about Bassi, JA-1417. Kaul has declared that Harkisoon's statement is false. JA-1485. A reasonable jury could determine that Harkisoon has not been truthful in her testimony about the negative feedback she received about Bassi, and could reject both that testimony and any other testimony that she offers.

Bassi submitted evidence from numerous sources contradicting Appellees and impeaching their credibility. Appellees' submissions may have sufficed to satisfy their burden to produce a legitimate non-discriminatory reason under the *McDonnell-Douglas* burden shifting formula but did not suffice for them to obtain summary judgment or judgment as a matter of law.

## POINT II.
## THE DISTRICT COURT IMPROPERLY IGNORED OR DISCOUNTED EVIDENCE OF RETALIATION AGAINST BASSI FOR HIS COMPLAINT OF DISCRIMINATION.

The lower court dismissed Bassi's retaliation claims claiming that he had not submitted any evidence from which a fact finder could infer retaliation. As with his discrimination claims, Bassi submitted evidence from which a reasonable jury could conclude that Appellees retaliated against Bassi once he objected to the Program's discrimination against him.

43

**A.  Appellees' Prior Adverse Actions Against Bassi Do Not Remove the Inference Of Retaliation.**

The lower court claimed that Bassi could not demonstrate an inference of retaliation because before his complaint, Appellees had already begun to criticize his performance and place him on an academic action plan.  This simply gives rise to the question as to whether their prior negative evaluations and disparagement of Bassi were bona fide academic judgments or motivated by discrimination.  Bassi has already submitted evidence *supra* Point I that his performance was not deficient, and that the Core Faculty were motivated by discriminatory animus towards him and his religious practice.

Furthermore, although Bassi had been placed on an academic action plan, the last two updates on that plan confirmed that Bassi's performance had improved and that he had noted gains in the relevant competencies.  JA-645-652.  After Bassi complained, however his academic action plan was escalated to the more severe "remediation."  JA 637, 1245-1246.  Appellees have provided no explanation as to how Bassi, in such a brief span of time, could have gone from improving to performing so poorly that his academic action plan would be elevated to remediation.  In addition, other residents were also placed on academic action plans and remediation, including those that addressed serious patient safety issues.  SA-15-23.  Indeed, as discussed in Point II.B.2 *infra*, the program itself recognized that Harkisoon had used remedial measures such as academic action plans, remediation,

and probation in arbitrary fashion that created fear and uncertainty among residents. SA-39.

## B. Bassi Presented Evidence Directly Probative Of Retaliation

A larger flaw in the lower court's analysis is that it assumed that Bassi was relying on temporal proximity as the primary source of evidence for his retaliation claim. Most evidence submitted was probative of retaliation independent of both temporal proximity as well as Appellees' proffered reasons.

### 1. Direct Evidence of Retaliation

After Bassi brought his complaint to the Human Resources department of both Phelps and Open Door, he told his advisor at the time, Puthiyamadam, that he had done so. In response, Puthiyamadam told him "You just made things worse for yourself." JA-1242. When asked about this, Puthiyamadam said she did not recall whether she said so or not, but did not deny that she may have said it. Puthiyamdam JA-1424-1425. A jury could believe Dr. Bassi's testimony, particularly when Puthiyamadam did not deny it.

The lower court ignored multiple instances in the record where members of the CCC confirmed their knowledge of the complaint, and the issue was brought up in the context of evaluating Bassi. Puthiyamadam testified that Bassi advised her of his complaint. JA-1423-1424. Paul and Andron both acknowledged Bassi's

complaint in an advisory meeting, and when Bassi raised his concern that it was being held against him, said that he had to learn how to cope with "anger and resentment." JA-763. Finally, Harkisoon, when discussing precepting schedules with faculty, advised she would not precept Bassi "as I was accused of prejudice." JA-1308. The Core Faculty and CCC were well aware of Bassi's complaint, and the lower court's finding that no evidence of retaliation was presented because "the CCC's post-complaint decisions were unanimous and no evidence was presented to suggest members of the CCC discussed the HR complaint" cannot be sustained.

## 2.  Other Complaints Of Retaliation

The record contains abundant evidence that both residents and faculty were afraid to raise any complaints for fear of retribution from Harkisoon. This includes the following.

- Multiple residents accompanied Kaul to NYMC's designated institutional official to express their concerns about the program, only to be told that they could not remain anonymous, and that the complaint would be forwarded to Harkisoon. JA-1487, 1493, 1503.

- Kaul was threatened by Harkisoon when she sought to leave the program. Harkisoon told Kaul that she could not leave without her permission, and that if she did, she would not be able to find a job in the field of Family Medicine. JA-1488.

- Kaul subsequently complained to Open Door, and Open Door confirmed that many Open Door staff had complained about Harkisoon for bullying behavior. *Id.*

46

- Testimony by residents, confirmed by Phelps's own investigation, that residents were pressured to only provide positive feedback in the surveys. JA-1493, 1502, SA-24-36.

- Andron, the program's behavioral health specialist, Dr. Puthiytamadam both acknowledged that other residents expressed fear of speaking out due to retaliation by Harkisoon. JA 1429, 1432.

- Andron testified that she left due to "disagreements about the program," specifically mentioning Harkisoon's refusal to accommodate Ms. Andron's request to spend more days working from home after an accident that resulted in a serious head injury. JA-1432.

- When, in 2019, Phelps investigated complaints about the Program, one Core Faculty member sought to speak with the investigator, but was so afraid of potential retaliation by Harkisoon she did not want to be seen even in the vicinity of the Human Resources office. SA-29.

- Phelps's own Performance Improvement Plan for Harkisoon, which determined that "residents and faculty feel that questioning and dissent lead to punitive actions." SA-39.

A reasonable jury could conclude from the above that Harkisoon and those under her retaliated against those who spoke up concerning any deficiencies in the Program, including Bassi when he complained about discrimination. Phelps itself reached this conclusion when its investigation concluded "There is a common theme of favoritism, fear of retaliation and the lack of comfort to bring up concerns without retribution that came through during our conversations with most of the individuals that were spoken to." SA-32. If Phelps can believe this, then a jury certainly can.

### C.    Bassi Presented Pretext Evidence Of Retaliation

Finally, the evidence of pretext cited in Point II, *supra* in support of Bassi's discrimination claim can apply equally to Bassi's retaliation claim. And as with Bassi's discrimination claims, a jury is entitled to reject the testimony of Harkisoon and the Core Faculty in their entirety due to their status as interested witnesses, as well as Phelps's own assessment of Harkisoon's lack of credibility.

## POINT III.

## THE LOWER COURT ERRED IN DISMISSING BASSI'S CLAIM FOR BREACH OF CONTRACT AND IN DENYING BASSI SUMMARY JUDGMENT FOR THAT CLAIM.

The lower court granted defendants' motion for summary judgment dismissing Bassi's claim for breach of contract and denied Bassi's motion for partial summary judgment on that claim.[2] This was error. The Appellees breached the residency contract entered into by the Program and Bassi.

A medical residency is a hybrid relationship that is both a student-university and employer-employee relationship. *Easaw v St. Barnabas Hosp.*, 142 Misc. 2d

---

[2] Bassi also asserted a claim in the alternative for Tortious Interference With Contract as against NYMC and Open Door to the extent they claimed they were not parties to the Residency Agreement. The lower court did not reach the question of whether NYMC and Open Door were parties to the contract because it dismissed the tortious interference claim on the ground that it could not stand in the absence of a breach of contract. Bassi has appealed the dismissal of the tortious interference claim as well and reserves his right to respond to any arguments raised by Appellees but not addressed by the lower court.

48

480, 489-490 (Sup. Ct., Bronx County 1989); *Abdel-Raouf v Yale Univ.*, 2015 US Dist. LEXIS 18966, at \*7 D Conn. Feb. 17, 2015, No. 3:12CV776 (HBF).  In this case, Bassi entered into written contracts governing PGY-1 and PGY-2.  In addition, under New York law, contracts between students and universities include and incorporate the "university's bulletins, circulars and regulations made available to the student." *Vought v. Teachers Coll., Columbia Univ.,* 127 A.D.2d 654 (2d Dep't 1987).  The school is also required to act in good faith in its dealings with students. *Olsson v. Bd. of Higher Educ.*, 49 N.Y.2d 408, 413-14 (1980).

## A.    Appellees Failed To Implement The Appeals Committee's 2017 Decision.

Paragraph 11 of the residency contracts signed by the parties provides that Bassi is guaranteed a right to appeal any adverse decision concerning his continuation in the Program, with guarantees of due process.  JA 189, 953..

Bassi utilized the Program's appeals procedure.   Indeed, the Appeals Committee's decisions, which are explicitly identified as "final" in the Program's published guidelines (JA-968), were favorable to Bassi.  JA 982-983.  With respect to the 2016 decision, the Appeals Committee upheld the Program's decision not to promote Bassi to PGY-3, but also ruled that he should be permitted to repeat the PGY-2 year, rather than be terminated from the Program.

Bassi completely prevailed in his 2017 appeal. The Appeals Committee rejected the Program's determination that Bassi had not demonstrated the required

competencies to advance in the program and found "objective evidence to support Dr. Bassi's claim to relief." The Appeals Committee specifically found that "Dr. Bassi has demonstrated sufficient competency in numerous venues so as to counterveil the issues which previously arose." JA-982-983. The Appeals Committee's directive was straightforward: that Bassi "be reinstated and allowed to complete any outstanding rotations needed to finish his training." *Id.* The Appeals Committee's final decision further required that Bassi do so "under supervision by other clinical faculty." JA-982. The Appeals Committee initially went even further, as it was so concerned the Program could not fairly evaluate Bassi that it directed that Bassi complete his work under the supervision of faculty in another NYMC Family Medicine residency program. JA-983. However, as a result of apparent influence by NYMC's counsel, the Appeals Committee modified that decision. JA-984.

The Program's interference with and refusal to implement the Appeals Committee's decisions constitute a breach of contract. The residency contracts set forth an appeals procedure that guarantee residents due process. The *ex parte* communications between Program representatives and the Appeals Committee resulted in a modified decision without Bassi's input, which is also a violation of Bassi's due process. *See Furey v Temple Univ.*, 884 F Supp 2d 223, 257 (ED Pa 2012) ("Ex parte conversations are a due process violation if 'the integrity of the

process and the fairness of the result' is tainted by the communication"); *quoting Gomes v. Univ. of Maine Sys.*, 365 F. Supp. 2d 6, 35 (D. Maine 2005).[3]

The Program failed to implement the Appeals Committee's decision. The Appeals Committee held that Bassi "should be reinstated and allowed to complete any outstanding rotations needed to finish his training." JA-982-983. The Program instead required Bassi to repeat PGY-2 for a third time and placed Bassi on a four month probationary period. JA-973-974. Further, although the Appeals Committee determined that Bassi should complete his training under the supervision of "different clinical faculty", the Program only appointed a new academic advisor for Bassi. *Id.*

A medical residency that refuses to implement decisions of its own appeals process has breached its contract with the resident. *See Barsoumian v. Univ. at Buffalo*, 2012 U.S. Dist. LEXIS 36929, 06-CV-831S (W.D.N.Y. March 18, 2012) (Granting plaintiff's motion for partial summary judgment on breach of contract claim when university failed to implement grievance committee decision reinstating him to residency). In the present matter, the Program refused to implement the decision of its Appeals Committee, and instead set Bassi up to fail stripping him of

---

[3] Bassi is not asserting that Appellees are state actors and did not assert a claim under 42 U.S.C. §1983. Rather, "due process" in this case refers to the contractual promise of the same in the residency contract.

credit for the rotations he had successfully completed and by imposing a condition of probation on reinstatement.

The lower court nevertheless granted summary judgment to defendants, finding that the Appeals Committee's 2017 decision did not mean what it actually said. In doing so, it ruled that the decision merely reversed the termination of Bassi's residency, referencing the language that "no new information was presented [to] warrant the committee's departure from its prior decision to reinstate Dr. Bassi.".[4] The court downplays the very next sentence, which as noted in Point I.B.1.f, contrasted its 2016 finding that Bassi exhibited some deficiencies warranting non-promotion, with the 2017 decision, which explicitly stated that Bassi had corrected such deficiencies ("Dr. Bassi has demonstrated sufficient competency in numerous venues so as to counterveil the issues which previously arose."). The following sentence specifically refers Bassi's score on the In Training Examination as an objective indicator of competence, and notes that it "occurred following the committee's prior decision." This further underscores that the Appeals Committee was relying on subsequent evidence that stood in contrast and "counterveiled" its prior decision.

---

[4] As noted in Point I *supra*, the court previously interpreted this language to refer to the failure to promote Bassi, to justify reading it to say the committee believed Bassi did not demonstrate competency. The lower court here reinterprets it to hold that the Committee was merely addressing plaintiff's termination in its "prior decision."

Even when the Appeals Committee found in 2016 that Bassi had not demonstrated sufficient competency to be promoted to PGY-3, it rejected the Program's probationary requirement and directed the Program to allow Bassi to repeat the PGY-2 year in its entirety, with credit given for rotations he successfully completed. Under the lower court's reasoning, the 2017 decision that fully granted relief to Bassi allowed the program to impose punitive measures not even permitted by the committee in 2016, i.e. imposing a four month probation and stripping Bassi of credit for the rotations he successfully completed.

The lower court stated that the decision did not explicitly order that Bassi be promoted to PGY-3. That is, so, however, because during Bassi's repeat PGY-2 year, he completed most of the rotations, clinic visits, and surgical procedures that were required not simply to be promoted to PGY-3, but to complete the residency entirely. Bassi was assigned PGY-3 rotations during his repeat PGY-2 year, and, as noted above, received passing evaluations in all of them, and further completed most of the procedures and clinic visits needed to complete the program in its entirety. JA-940.

As such, when the Appeals Committee issued its decision, it required that Bassi be reinstated "and allowed to complete any outstanding rotations needed to finish his training." Program officials had no problem understanding what this directive meant. Strongwater, the former chair of the GMEC, confirmed that it meant

Bassi had to complete the remaining rotations, not repeat the PGY-2 year. JA-1071. The subsequent chair of the GMEC, Dr. Murray, also confirmed that the decision meant that Bassi was required to complete the rotations he had failed to successfully complete. JA-1458. Indeed, in justifying making Bassi repeat the PGY-2 year for a third time, Murray explicitly relied on the "Record of Training" prepared by Harkisoon and claimed "you have not completed sufficient credits to return to the program as a PGY-3." JA-990.

The 2017 decision found that Bassi had met the required competencies to advance in the program, specifically acknowledged that Bassi had addressed the deficiencies that led the committee to uphold non promotion one year before, and directed that Bassi be allowed to "complete any outstanding rotations needed to finish his training" and to do so under different clinical supervision. The Program failed to do this, and by doing so breached the provisions of the residency agreement.

**B.    The Program Breached the Residency Contracts by Denying Appropriate Credit for Work that Bassi Successfully Performed.**

New York Law recognizes that any contractual relationship between student and university contains an implied agreement that the university will award appropriate credit, and ultimately a degree, when the student successfully completes his work. As explained by the Second Circuit, "[u]nder New York law, an implied contract is formed when a university accepts a student for enrollment: if the student

complies with the terms prescribed by the university and completes the required courses, the university must award him a degree." *Papelino v Albany Coll. of Pharm. of Union Univ.*, 633 F3d 81, 93 (2d Cir. 2011), *citing Carr v. St. John's Univ.*, 17 A.D.2d 632, 633 (2d Dep't 1962), *aff'd*, 12 N.Y.2d 802.

In this matter, Bassi received a passing grade in five separate "Pass/Fail" rotations for which the Program denied him credit. JA-999-1006 In addition, despite Bassi submitting to the Program his evaluations for rotations where he received "Meets Expectations" or greater in each category of the evaluation, the Program denied him credit for each of those rotations. JA-1007-1059.

With the exception of his Gynecology-2 rotation, where his on-call schedule prevented him from attending enough sessions, Bassi was never informed that he had not successfully completed any rotation. JA-938, 945. That is because the decision to not credit Bassi for the rotations was not made until May 2017, where Harkisoon and the CCC retroactively decided to deny Bassi credit for all but five rotations that he had completed over his past two years in the Program. JA-1060-1061. These evaluations were not made based on whether Bassi had demonstrated competency in the rotation, but were made because the Program assumed that Bassi would be terminated and would have to start anew if he transferred to another residency. *Id.*

55

The Program's retroactive denial of Bassi's rotation credit is not authorized or otherwise permitted by any Program guidelines, the residency contracts, or Resident Handbook.  Indeed, under the Resident Handbook, in the event a resident does not satisfactorily complete a rotation, he or she is assigned appropriate remedial work to complete the rotation.  JA-963-964.  Program faculty and faculty at other residency programs have confirmed that the Program's decision to retroactively deny Bassi credit for rotations in this manner is inconsistent with the Program's practices and Family Medicine residency practice generally.  JA-1066-1067, 1071.

The lower court rejected this claim, holding that there is no such thing as "credit" in a medical residency. This is directly contradicted by the Program's own documents and Appellees' witnesses.  Although a medical residency may not use aggregate numerical "credits" as an undergraduate program may, the Program in this case explicitly required that the residents complete rotations to graduate, and used the term credit to refer to such successful completion. The guidelines for the appeals committee explicitly allow appeals for the denial of credit for a particular rotation. JA-968.  More significant, as noted in Point III. A. *supra*, the then chair of the GMEC justified requiring Bassi to repeat PGY-2 a third time because "you have not completed sufficient credits to return to the program as a PGY-3."  JA-990. Appellees explicitly relied on Bassi failing to obtain credit for his rotations when they justified not promoting him to PGY-3.

**C.    The Program Failed to Provide Bassi with Contractually Required Notice of Non-Promotion.**

Paragraph 2 of the residency contracts entered into by Bassi, Phelps, and Harkisoon, on behalf of the Program, incorporates the provisions of the Program's Resident Handbook.  JA-186-187, 950-951.  Section VIII of the Resident Handbook states as follows:

> Residents will be informed no later than February 1 if they are not going to be promoted to the next academic PGY level.  After February 1, this promotion may be rescinded if the resident fails to meet the ACGME minimum training standards.  In this event, the Program Director will make such recommendation to the GMEC [GMEC], where a final decision will be made.

JA-962.

There is no dispute that the Program failed to meet the February 1 non-promotion deadline mandated by the Resident Handbook, and also failed to make any recommendation to the GMEC to rescind Bassi's promotion, after that date.  Instead, the Program sent Bassi a "Notice of Termination" dated June 17, 2016 - more than four and a half months after the February 1, 2016 deadline - notifying Bassi that he would not be promoted to PGY-3 and that he would be terminated from the Program effective December 31, 2016 unless he satisfies specified requirements of a six-month probationary period.  JA-206-207.

The Program further violated the notice requirements of the Resident Handbook when it attempted to terminate Bassi's residency on two occasions.

57

Section VIII of the Resident Handbook provides the following termination notice requirements:

> Residents will be notified as early as possible when a resident contract is not to be renewed for the next academic year. PGY-1 residents will be notified at least 6.5 months prior to the expiration of their contract and PGY-2 and PGY-3 residents will be notified at least 7.5 months prior to the expiration of their contract. Residents with contracts for less than 12 months will be given notice of non-renewal by the first day after one half of the duration of their contract.

JA-962.

The Program failed to comply with these termination notice requirements. The Program's June 17, 2016 "Notice of Termination" denied Bassi promotion to PGY-3 and terminated his residency effective December 31, 2016 unless he met specified requirements of a six-month probationary period – again, shorter than the 7 ½ months' notice required. JA-206-207.

In 2017, the Program again violated the termination notice requirement mandated by the Resident Handbook. In April 2017, shortly before Bassi's scheduled two-week vacation, he was told by Harkisoon that upon his return he would be immediately terminated from the Program effective May 8, 2017, a decision that was reversed after Bassi addressed the matter with Richard McCarrick, the Vice Dean of Graduate Medical Education for NYMC. JA-941. The Program again violated this requirement when the Program sent Bassi a second notice on June

58

9, 2017 stating that he was terminated from the Program effective June 30, 2017. JA-970-972.

The lower court rejected these claims by stating that the various notices of remediation and probation constituted notice of both non-promotion and termination. The notices say no such thing. The November 13, 2015 academic action plan stated that Bassi "may not" be promoted if he did not meet the terms of the plan (JA-651), and the subsequent documents cited by the Court do not discuss whether Bassi will be promoted or not at all. JA 652, 673, 701. Indeed, the December 18, 2015 correspondence (shortly before Bassi complained about the discriminatory comments directed toward his religious headwear) noted that Bassi had made gains in the competencies in question. JA-652.

The Program, when placing Harkisoon on a performance improvement plan and ultimately asking her to leave the Program, noted that Harkisoon had used measures such as academic action plans, remediation, and probation in an unpredictable manner, and that doing so created "fear and uncertainty" among residents. SA-39. GMEC chair Strongwater also averred the program was not giving Bassi adequate notice. JA-1071. The language of the Resident Handbook and the testimony of Dr. Strongwater reject the amorphous interpretation of the notice provisions offered by Appellees and accepted by the Court. And both confirm

that, as a matter of law, Appellees breached the provisions of the residency agreement.

## **CONCLUSION**

For the aforementioned reasons, Dr. Bassi respectfully requests that the lower court's decision be reversed in its entirety, and that this Court direct the lower court to deny Appellees' motion for summary judgment and grant Dr. Bassi's motion for partial summary judgment on his claim for breach of contract.

Dated:  June 8, 2023
      New York, NY

                LAW OFFICES OF JOSHUA PARKHURST

                By:  /s/ Joshua Parkhurst

                Joshua Parkhurst
                11 Broadway, Suite 615
                New York, NY  10004

## <u>CERTIFICATE OF COMPLIANCE</u>

1.     This brief complies with the type-volume limitation of Fed R. App. P 28(1)(e)(2)(A) and Local Rule 32.1(a)(4)(A) because this brief contains 13,471 words, excluding the parts of the brief exempted by Fed R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed R. App. P. 32(a)(5) and type style requirements of Fed R. App. P. 32(a)(5) and type style requirements of Fed R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14 Point Times New Roman.

Dated:  June 8, 2023
        New York, NY

                                        LAW OFFICES OF JOSHUA PARKHURST

                                        By:   /s/ Joshua Parkhurst

                                        Joshua Parkhurst
                                        11 Broadway, Suite 615
                                        New York, NY  10004

Special Appendix

i

## TABLE OF CONTENTS
*(Special Appendix)*

Opinion and Order of Hon. Nelson S. Roman,
Dated March 2, 2023, Appealed From .......................................................SPA-1

Judgment of United States District Court Southern District of
New York, Dated March 2, 2023.............................................................SPA-35

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ___3/2/2023___

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HARMEETINDER BASSI, M.D.,

                                    Plaintiff,

        -against-

NEW YORK MEDICAL COLLEGE, PHELPS
MEMORIAL HOSPITAL ASSOCIATION, d/b/a
PHELPS HOSPITAL, NORTHWELL HEALTH, INC.
d/b/a OPEN DOOR FAMILY MEDICAL GROUP,
and SHANTIE HARKISOON, M.D.,

                                    Defendant.

No. 19 Civ. 7542 (NSR)

**OPINION & ORDER**

NELSON S. ROMÁN, United States District Judge

Plaintiff Harmeetinder Bassi, M.D., ("Plaintiff" or "Dr. Bassi") commenced this action against Defendants New York Medical College ("NYMC"), Phelps Memorial Hospital Association, d/b/a Phelps Hospital ("Phelps"), Northwell Health, Inc. d/b/a Open Door Family Medical Group ("Open Door"), and Shantie Harkisoon, M.D., ("Dr. Harkisoon) (collectively, "Defendants"), asserting claims for workplace discrimination, retaliation, breach of contract, and tortious interference. (Amended Complaint ("Am. Compl."), ECF No. 61.)

Presently before the Court are (1) Open Door's motion for summary judgment (ECF No. 100), (2) Phelps's motion for summary judgment (ECF No. 104), (3) NYMC's motion for summary judgment (ECF No. 107), and (4) Plaintiff's cross-motion for partial summary judgment on its claims for breach of contract and tortious interference (ECF No. 111). For the following reasons, the Court GRANTS Defendants' motions for summary judgment, and the Court DENIES Plaintiff's cross-motion for summary judgment.

1

## BACKGROUND

### I.      Factual Background

The parties have submitted briefs, statements of material facts pursuant to Local Civil Rule 56.1, and the record and exhibits from discovery in the instant proceeding, which reflect the following factual background.

#### A.  The Family Medicine Residency Program

Dr. Bassi was a medical resident in the Family Medicine Residency Program (the "Program"). (Am. Compl. at ¶ 28.) The Program was created on March 29, 2011 through an Affiliation Agreement between NYMC, Open Door, and Phelps. (NYMC Statement of Undisputed Facts ("NYMC 56.1") at ¶ 2, ECF No. 110.) NYMC was the Program's sponsoring institution and monitored the Program's compliance with accreditation standards set by the Accreditation Council for Graduate Medical Education ("ACGME"). (Open Door Statement of Undisputed Facts ("Open Door 56.1") at ¶¶ 1–2, ECF No. 101.) Phelps employed Program administrators, including Program Director Dr. Harkisoon, provided financial support to the Program, and housed the majority of the Program's inpatient rotations. (Phelps Statement of Undisputed Facts ("Phelps 56.1") at ¶ 3, ECF No. 106; Open Door 56.1 at ¶ 3.) Open Door served as the Program's outpatient clinic and family health center. (Open Door 56.1 at ¶ 9.)

The Program entails three years of residency requirements. During the first year of the Program ("PGY-1"), residents are required to spend four hours per week at Open Door, completing one patient encounter per hour. (*Id.* at ¶12.) During the second year of the Program ("PGY-2"), residents are required to spend eight hours per week at Open Door, completing one patient encounter every thirty to forty-five minutes. (*Id.* at ¶ 14.) During the third and final year of the

2

Program ("PGY-3"), residents are required to spend twelve hours per week at Open Door, completing each patient encounter within thirty minutes or less.  (*Id.* at ¶ 16.)

Open Door physicians supervise, or "precept," residents in their patient interactions at the Clinic.  (Phelps 56.1 at ¶ 15.)  Some of these physicians are considered "Core Faculty," and they are involved in overseeing clinical performance, advising residents, and submitting summative evaluations to the Clinical Competency Committee ("CCC").  (Open Door 56.1 at ¶¶ 19–21; Plaintiff's Response to Open Door Statement of Undisputed Facts ("Plf. Resp. 56.1 Open Door") at ¶ 19, ECF No. 123.)  As required by ACGME guidelines, the Program chartered the CCC to evaluate resident performance.  (Phelps 56.1 at ¶ 30.)  The CCC is comprised of the Program Director, Core Faculty, and, at times, additional faculty members.  (*Id.* at ¶ 31; Plaintiff's Response to Phelps Statement of Undisputed Facts ("Plf. Resp. 56.1 Phelps") at ¶ 31, ECF No. 121.)

**B.  Dr. Bassi's Admission to the Program and PGY-1 Year (2014–15)**

Dr. Bassi practices Sikhism.  (Phelps 56.1 at ¶ 56.)  As part of his religious practice, Dr. Bassi covers his head when he is in public, including at all times during his residency.  (*Id.* at ¶¶ 57–58.)  Although Dr. Bassi always covers his head with a smaller garment called a patka, he often wears a turban over the patka.  (*Id.* at ¶ 57.)  For example, during his residency, Dr. Bassi often covered his patka with a turban.  (*Id.* at ¶ 60.)  He did so during his interview and during his time spent at the Clinic.  (*Id.* at ¶¶ 59–60.)  Sometimes Dr. Bassi would remove his turban and wear only his patka, such as when he would conduct surgeries, assist in newborn deliveries, or work overnight shifts.  (*Id.* at ¶ 61.)

Dr. Bassi joined the Program on July 1, 2014, pursuant to a one-year employment contract (the "Contract") subject to renewal in successive years.  (First Declaration of Harmeetinder Bassi ("First Bassi Dec.") Ex. B, ECF No. 114.)  Both the original and renewed versions (*see* First Bassi

3

Dec. Ex. C) of the Contract state that "disputes over the application, non-renewal, or termination of this agreement (or of the Hospital's intent to renew this Agreement but not promote you to the next level of training) shall be handled in accordance with the grievance procedure as set forth in the Resident Handbook." (Contract at ¶ 11.) In the event of a dispute, a resident retains "the right to appeal any adverse decisions affecting [their] continuation in the program" and is "guaranteed due process." (*Id.*)

The Contract incorporates provisions from the Resident Handbook (the "Handbook") (Contract at ¶ 2), including provisions related to promotion and adverse decisions. The Handbook "sets forth criteria for successful completion of rotations." (Plf. Resp. 56.1 Phelps at ¶ 67.) Where the Program denies a resident's promotion, the Handbook states as follows:

> Residents will be informed no later than February 1 if they are not going to be promoted to the next academic PGY level. After February 1, this promotion may be rescinded if the resident fails to meet the ACGME minimum training standards. In this event, the Program Director will make such recommendation to the GMEC, where a final decision will be made.

(First Bassi Dec. Ex. E., Sec. VIII.) Where a resident fails "to meet minimum academic standards," the Program will provide "opportunities for remediation." (*Id.* at Sec. VIII.4.) Should the resident "fail[ ] to correct the identified academic deficiencies to the satisfaction of the program requirements within the specified time frame," the Program may either extend the remediation procedure or proceed with "probation and possible termination." (*Id.*)

Dr. Bassi passed PGY-1. Dr. Bassi's first performance evaluation was issued in October 2014. (Affirmation of John P. Keil ("Keil Dec.") Ex. 6, ECF No. 109.) At that time, Dr. Bassi's performance was "appropriate for [his] level of training," and he displayed a "positive attitude" and a "warm and caring disposition." (*Id.*) Dr. Bassi, however, lagged behind the required patient encounters for his level of training, did not log enough patient encounters, and demonstrated

deficiencies in medical knowledge.  (*Id.*)  Dr. Bassi's August 2015 evaluation reported additional

deficiencies: he performed "significantly below national average" on his in-training exams, failed

to timely complete medical charting, and struggled to "gather[ ] appropriate information and

develop[ ] evidence-based management plans."  (*Id.* at Ex. 7.)  "Overall," the evaluation concluded,

Dr. Bassi "is a kind physician who can improve."  (*Id.*)  These "areas for improvement include

overall academic performance, affect-management and self care, including seeking appropriate

support as needed."  (*Id.*)  On September 4, 2015, the CCC placed Dr. Bassi on an academic action

plan.  (Phelps 56.1 at ¶ 71.)

### C.  Dr. Bassi's First PGY-2 Year (2015–16)

Although the CCC acknowledged Dr. Bassi's improvement when it reassessed his

performance on October 16, 2015 (Keil Dec. Ex. 8), Dr. Bassi continued to receive constructive

feedback during the first half of his PGY-2 year.  For example, a November 14, 2015 ambulatory

evaluation gave Dr. Bassi a range of "fair" to "excellent" marks on his sessions, noting that Dr.

Bassi was "open and willing to accept feedback" but needed to better incorporate prior feedback,

timely "follow up and appropriately address[ ] lab results," and conduct "full" exams to

"demonstrate" he is "ruling out" certain diagnoses.  (*Id.* at Ex. 9.)  In addition, on January 22,

2016, the CCC advised Dr. Bassi to obtain a neuropsychological evaluation to help him "learn,

retain, generalize, and apply information" in a clinical setting.  (*Id.* at Ex. 15.)  The CCC also

advised Dr. Bassi to seek resources that would help him "navigate and manage [his] anxiety" that

"seem[ed] to interfere" with his performance at the Clinic.  (*Id.*)  The CCC expressed that "severe

concerns persist regarding [Dr. Bassi's] medical knowledge and application."  (*Id.*)  By that time,

Dr. Bassi had known for over two months that the Program might not renew his contract for the

PGY-3 year.  (*Id.* at Ex. 10.)

5

On or about January 21, 2016, Chief Resident Thomas Chattahil informed Dr. Bassi that the Core Faculty believed his performance was unsatisfactory and that he looked unprofessional when wearing only his patka. (Plaintiff's Rule 56.1 Counterstatement ("Plf. Counter") at ¶ 22.) Dr. Harkisoon had told the Core Faculty as early as Dr. Bassi's PGY-1 year that Dr. Bassi looked like a "thug" when he wore the patka. (*Id.* at ¶¶ 22–24.) In response to those comments, Dr. Rachna Kaul confronted Dr. Harkisoon and reminded her that Dr. Bassi's patka was an appropriate head covering. (*Id.* at ¶¶ 25–26.) When Dr. Bassi learned of Dr. Harkisoon's comments, Dr. Bassi filed a formal complaint with Open Door and Phelps's Human Resources Departments. (*Id.* at ¶ 27.) Upon learning of Dr. Bassi's complaint, his faculty adviser Mary Rose Puthiyamadam told him, "You just made things worse for yourself." (*Id.* at ¶ 28.) On January 28, 2016, Dr. Kaul sent an email to Lindsey Farrell, President and CEO of Open Door, informing Ms. Farrell that Dr. Harkisoon had "been harassing [Dr. Bassi] for multiple different reasons since the day he arrived" and had "threatened" to "terminate him" "multiple times." (*Id.* at ¶¶ 30–31.) Dr. Bassi, Dr. Harkisoon, and Human Resources representatives met that same day. (*Id.* at ¶ 32.) At the meeting, Dr. Harkisoon apologized (Phelps 56.1 at ¶ 87), acknowledged that Dr. Bassi could wear any religious articles he wished (*id.* at ¶ 88), invited (but did not mandate) Dr. Bassi to educate his peers about his religious practices (*id.* at ¶ 89–90), and encouraged Dr. Bassi to raise any future concerns (*id.* at ¶ 91). Dr. Harkisoon did not make any further comments regarding Dr. Bassi's religion.[1] (*Id.* at ¶ 92.)

Dr. Bassi continued to receive negative performance reviews during the second half of his PGY-2 year. In a February 4, 2016 ambulatory evaluation, Dr. Rebecca Collins observed that Dr.

---

[1] Plaintiff disputes this fact, but Plaintiff does so by reference to comments he asserts were made during Plaintiff's PGY-1 year. (*See, e.g.,* Plf. Resp. 56.1 Phelps at ¶ 93.) Plaintiff provides no evidence Dr. Harkisoon continued to make comments about Plaintiff's religion after the January 28, 2016 meeting.

**[SPA-7]**

Case 7:19-cv-07542-NSR-AEK   Document 150   Filed 03/02/23   Page 7 of 34

Bassi was "not at the level that is expected in his clinical care or that of his peers," further concluding that he struggled with "multiple levels of the [patient] encounter." (Keil Ex. 16.) Dr. Collins also commented that she had to "reassign [Dr. Bassi's] patients to other providers" and harbored concerns about Dr. Bassi's "medical knowledge." (*Id.*) On February 12, 2016, the CCC again warned Dr. Bassi of his potential termination from the Program and placed him on another remediation plan. (*Id.* at Ex. 17.) In a February 29, 2016 evaluation, Dr. Collins reported that Dr. Bassi saw only four patients during the entire clinical session and failed to ask patients basic questions related to their diagnoses. (*Id.* at Ex. 18.) Dr. Collins identified several "areas of concern," including "incomplete histories," "inadequate medical knowledge on common illnesses," and "incomplete documentation." (*Id.*) Dr. Samantha Rai noted in a March 1, 2016 evaluation that Dr. Bassi did not "demonstrat[e] medical knowledge" requisite with his level of training and required "intervention" during "most" of his patient encounters. (*Id.* at Ex. 19.) Dr. Bassi's March 2016 summative evaluation followed, in which Dr. Puthiyamadam identified a lack of improvement and questioned Dr. Bassi's competence "to see patients independently." (*Id.* at Ex. 22.) As such, the CCC extended Dr. Bassi's remediation until June 2016, citing a failure to improve. (*Id.* at Ex. 23.)

**D. Dr. Bassi's Second PGY-2 Year (2016–17)**

On June 17, 2016, the CCC sent Dr. Bassi a "Notice of Termination." (*Id.* at Ex. 26.) The CCC placed Dr. Bassi on academic probation and decided not to promote Dr. Bassi to PGY-3. (*Id.*) It warned Dr. Bassi that the Program would terminate Dr. Bassi's employment on December 31, 2016 if he did not meet the expectations of his remediation plan. (*Id.*) The remediation plan required Dr. Bassi to, among other things, (1) provide "safe, independent patient care (with supervision immediately available) at a rate of 6-8 patients per half day session," (2)

7

"[d]emonstrate knowledge and application of sciences appropriate to PGY-2 level of training," (3) "[d]emonstrate ongoing initiative in learning and improvement in all ACGME competencies," and (4) "[m]aintain communication regarding expectations/assignments." (*Id.*) Dr. Bassi appealed the CCC's decision.  (Phelps 56.1 at ¶ 115.)

The Appeals Committee, which is comprised of three uninvolved members of the medical staff, upheld the CCC's decision to not promote Dr. Bassi to PGY-3.  (Keil Dec. Exs. 27, 28.)  On the one hand, the Appeals Committee found Dr. Bassi had "demonstrated deficiencies with regards to his PGY-2 performance" and "failed to meet expectations of the PGY-2 level of training." (*Id.* at Ex. 28.)  These deficiencies justified denying Dr. Bassi's promotion.  On the other hand, the Appeals Committee observed Dr. Bassi's "positive attitude," "expressed willingness to learn," "desire to become a physician," and "several" examples of "praiseworthy care" and "patient interactions." (*Id.*)  As such, the Appeals Committee recommended Dr. Bassi repeat PGY-2 rather than face termination on December 31, 2016.  (*Id.*)  The Program accepted the Appeals Committee's recommendation, extending Dr. Bassi's contract through the remainder of the 2016–17 academic year.  (*Id.* at Ex. 29.)  Consistent with the Appeals Committee's acknowledgement that "increased supervision" would be necessary to "help [Dr. Bassi] succeed" (*id.* at Ex. 28), the Program placed Dr. Bassi on the same remediation plan included in the Notice of Termination. (*Id.* at Ex. 29.)

Dr. Bassi, unfortunately, continued to receive negative evaluations.  Dr. Sara Paul, Dr. Bassi's adviser at the time (Phelps 56.1 at ¶ 121), reported a February 2017 patient visit in which Dr. Bassi made an incorrect diagnosis and included no findings to support his suggested diagnosis. (Keil Dec. Ex. 30.)  Dr. Paul, however, also reported on another encounter in which Dr. Bassi "did an excellent job" treating a "very challenging patient." (*Id.*)  On March 1, 2017, Dr. Rebecca

8

McAteer observed that Dr. Bassi "has not consistently demonstrated a[ ] systematic/algorithmic approach to patient care that follows the necessary rigorous, differential-driven, analytic process of obtaining subjective content from patient histories." (*Id.* at Ex. 31.)  Dr. McAteer further commented that Dr. Bassi was "unable to organize his thoughts and approach sufficiently to complete the . . . patient care process, a requirement for any medical clinician to have mastered, in a timely fashion." (*Id.*)  Dr. Samantha Rai recorded a patient visit that same month in which Dr. Bassi needed repeated prompting to ask questions related to aspects of that patient's history.  (*Id.* at Ex. 32.)  Dr. London Muse expressed concerns regarding Dr. Bassi's application of medical knowledge when assessing his patients.   (*Id.* at Ex. 33.)  She added that he failed to properly document patient visits and craft appropriate treatment plans.  (*Id.*)   The April 2017 summative evaluation reinforced these critiques:  despite the fact that "maximum resources" were invested to "support" his "learning and training," Dr. Bassi could not "concisely, clearly and accurately assess, treat, present and educate" his patients.  (*Id.* at Ex. 34.)  The CCC thus concluded Dr. Bassi did not meet the required level of competency to advance to PGY-3.  (*Id.*)

On June 2, 2017, the CCC held a pre-termination hearing regarding Dr. Bassi's dismissal from the Program (*id.* at Ex. 35), and on June 9, 2017, Dr. Bassi received a formal Notice of Termination (*id.* at Ex. 36).  The Notice identified specific performance deficiencies.  With respect to "[p]atient care," Dr. Bassi was unable to "consistently gather appropriate data from patients," "accurately summarize and record" that data, and "synthesize that data into an appropriate assessment and plan." (*Id.*)  Dr. Bassi displayed "significant improvement in in-training exam performance and some improvement in maintaining a learning portfolio," but he struggled to "apply knowledge appropriately" and "independently" "as expected at PGY-2 level of training." (*Id.*)  In addition, despite "having 22 DVDs of patient encounters," "at least 36 1:1 precepted clinic

sessions" "totaling well over 100 hours," and over a dozen adviser meetings, Dr. Bassi "continue[d] to require the same level of preceptor guidance." (*Id.*) Lastly, although Dr. Bassi showed "much improvement" in displaying "professionalism," he "require[d] biweekly reminders to consistently respond to emails, sign evaluations, complete required documentation[,] and maintain learning portfolio."  (*Id.*)  In view of Dr. Bassi's performance deficiencies, the CCC decided to terminate Dr. Bassi's employment effective June 30, 2017.  (*Id.*)  Dr. Bassi appealed the CCC's decision to the same panel that ruled on his prior appeal.  (Phelps 56.1 at ¶ 131.)

The Appeals Committee reinstated Dr. Bassi "to complete any outstanding rotations needed to finish his training." (Keil Dec. Ex. 38.)  The Committee directed Dr. Bassi to "complete these rotations in a different environment, within the larger NYMC . . . family, under supervision by other clinical faculty." (*Id.*)  The Committee found "[n]o new information" to "warrant . . . departure" from the Committee's prior ruling: Dr. Bassi had "demonstrated sufficient competency in numerous venues so as to countervail the issues which previously arose." (*Id.*)  The Committee reached its decision "without determining Dr. Bassi's claim that discrimination tainted his treatment as a resident." (*Id.*)

Nicholas Janiga, NYMC's Chief Legal Counsel, wrote to the Appeals Committee on August 30, 2017 to (1) report that Dr. Bassi had been informed of his reinstatement and would complete his outstanding rotations under supervision from a recently-hired attending physician, and (2) inform the Committee that NYMC no longer sponsored the Program.  (*Id.* at Ex. 39.)  In effect, Janiga conveyed to the Appeals Committee—and the Appeals Committee acknowledged— that the Committee "does not have the ability to place Dr. Bassi outside the [P]rogram." (*Id.* at Ex. 40.)  For that reason, the Committee revised its ruling to remove the requirement that Dr. Bassi complete his rotations in a "different environment." (*Compare id.* at Ex. 43 *with id.* at Ex. 38.)

Instead, the Committee directed Dr. Bassi to complete his rotations "under supervision by different faculty." (*Id.* at Ex. 43.)

The Program reinstated Dr. Bassi effective September 11, 2017, and the Program placed Dr. Bassi under new supervision from a recently-hired attending physician. (*Id.* at Ex. 44.) Plaintiff was reinstated as a PGY-2, and he was placed on a four-month remediation plan. (*Id.*) Dr. Bassi rejected the Program's decision to reinstate him as a PGY-2. (Phelps 56.1 at ¶ 146.) He now alleges he was constructively discharged. (*Id.*)

Dr. Bassi believes the Program's decision to deny him promotion to PGY-3 is based on his religion and his complaint to Human Resources in January 2016. (Plf. Resp. 56.1 Phelps at ¶ 147.) Dr. Bassi cites a number of reasons for his belief. First, discriminatory comments about Dr. Bassi's headwear occurred during his PGY-1 year. (*Id.* at ¶ 148 (citing Declaration of Rachna Kaul, M.D. ("Kaul Dec.") at ¶¶ 6–7, ECF No. 128).) Second, residents and faculty testified that Dr. Bassi was treated differently by Core Faculty in comparison to other residents. (*Id.* (citing Declaration of Edwin Roberts, M.D. ("Roberts Dec.") at ¶ 5, ECF No. 130; Declaration of Jessica Zaks, M.D. ("Zaks Dec.") at ¶¶ 5–8, ECF No. 131; Declaration of Heidi Mandy, M.D. ("Mandy Dec.") at ¶¶ 3–4, ECF No. 129; Declaration of Richard Strongwater, M.D. ("Strongwater Dec.") at ¶ 5, ECF No. 115; Kaul Dec. at ¶ 3–5, Ex. B).) Third, Dr. Bassi received positive evaluations from evaluators who were not apart of the Core Faculty. (*Id.* (citing First Bassi Dec. Exs. T, U; Second Declaration of Harmeetinder Bassi ("Second Bassi Dec.") at ¶¶ 8–11, 36–38, Exs. B, C, J, K, ECF No. 125; Zaks Dec. at ¶¶ 3–4; Roberts Dec. at ¶ 3; Mandry Dec. at ¶ 7; Second Declaration of Johnny Kovoor, M.D. ("Second Kovoor Dec.") at ¶¶ 6–7, Ex. B, ECF No. 127; Puthiyamadam Tr. 51:3–52:25).) Fourth, the Appeals Committee twice rejected the CCC's attempts to terminate Dr. Bassi's contract. (*Id.* (citing Keil Dec. Ex. 38).) And fifth, residents and faculty testified that Dr.

Harkisoon and members of the Core Faculty retaliated against individuals who provided critical feedback about the Program.  (*Id.* (citing Zaks Dec. at ¶¶ 9–13; Kaul Dec. at ¶¶ 10–12; Mandry Dec. at ¶ 6).)

## II.  Procedural History

Plaintiff filed this action on August 12, 2019 alleging claims for workplace discrimination, retaliation, breach of contract, and tortious interference.  (ECF No. 1.)  Plaintiff filed an Amended Complaint alleging the same claims.  (ECF No. 61.)  Defendants each file motions for summary judgment on all claims, and Plaintiff files a cross-motion for partial summary judgment on its breach of contract and tortious interference claims.[2]

## LEGAL STANDARDS

## I.  Standard of Review

Under Federal Rule of Civil Procedure 56(c), summary judgment must be granted if "there is no genuine issue of material fact and ... the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 n. 4 (1986).  "[G]enuineness runs to whether disputed factual issues can reasonably be resolved in favor of either party, [while] materiality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the

---

[2] All motions were fully briefed as of June 2, 2022.  (Open Door Motion for Summary Judgment, ECF No. 100; Open Door Memorandum of Law in Support of Open Door's Motion for Summary Judgment ("Open Door Mem."), ECF No. 102; Phelps Motion for Summary Judgment, ECF No. 104; Phelps Memorandum of Law in Support of Phelps's Motion for Summary Judgment ("Phelps Mem."), ECF No. 105; NYMC Motion for Summary Judgment, ECF No. 107; NYMC Memorandum of Law in Support of NYMC's Motion for Summary Judgment ("Phelps Mem."), ECF No. 108; Plaintiff's Memorandum of Law in Opposition to Defendants' Motions for Summary Judgment ("Plf. Opp."), ECF No. 117; Open Door Reply Memorandum of Law in Further Support of Open Door's Motion for Summary Judgment ("Open Door Reply"), ECF No. 134; Phelps Reply Memorandum of Law in Further Support of Phelps's Motion for Summary Judgment ("Phelps Reply"), ECF No. 137; NYMC Reply Memorandum of Law in Further Support of NYMC's Motion for Summary Judgment ("NYMC Reply"), ECF No. 136; Plaintiff's Cross-Motion for Summary Judgment, ECF No. 111; Plaintiff's Memorandum of Law in Support of Plaintiff's Cross-Motion for Summary Judgment ("Plf. Mem."), ECF No. 146; Open Door's Memorandum of Law in Opposition to Plaintiff's Cross-Motion for Summary Judgment ("Open Door Opp."), ECF No. 119; Phelps's Memorandum of Law in Opposition to Plaintiff's Cross-Motion for Summary Judgment ("Phelps Opp."), ECF No. 117; Plaintiff's Reply Memorandum in Further Support of Plaintiff's Cross-Motion for Summary Judgment ("Plf. Reply"), ECF No. 141.)

applicable substantive law." *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 5 (2d Cir. 1999) (internal quotations and citations omitted).  In order to prove that a genuine issue of material fact exists, a plaintiff "may not rest upon the mere allegations or denials of the pleading[s]," but must by affidavit or otherwise "set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  "Conclusory statements, conjecture or speculation by the party resisting the motion will not defeat summary judgment."  *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996).

Courts must resolve all ambiguities and draw all reasonable factual inferences in favor of the non-moving party.  *See Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998).  The moving party bears the initial burden of demonstrating an absence of genuine issues of material fact.  *See Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997).  If the initial burden is met, the non-moving party "must produce specific facts indicating that a genuine issue of fact exists.  If the evidence [presented by the non-moving party] is merely colorable, or is not significantly probative, summary judgment may be granted."  *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (internal quotations and citations omitted) (alteration in original).

The same standard of review applies when the Court is faced with cross-motions for summary judgment, as here.  *See Lauria v. Heffernan*, 607 F. Supp. 2d 403, 407 (E.D.N.Y. 2009) (citations omitted).  When evaluating cross-motions for summary judgment, the Court reviews each party's motion on its own merits, and draws all reasonable inferences against the party whose motion is under consideration.  *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).

**II.    Federal and State Workplace Discrimination Statutes**

Section 1981 guarantees "[a]ll persons within the jurisdiction of the United States . . . the same right . . . to the full and equal benefit of all laws and proceedings . . . as is enjoyed by white

13

citizens." 42 U.S.C. § 1981. In effect, Section 1981 "outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment." *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 224 (2d Cir. 2004).

Title VII, meanwhile, prohibits any employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

New York State Human Rights Law ("NYSHRL") "mirrors" these federal protections. *Brown v. Daikin Am., Inc.*, 756 F.3d 219, 226 (2d Cir. 2014).

Courts analyze discrimination claims brought under Section 1981, Title VII, and the NYSHRL using the burden-shifting analysis articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010) (Section 1981); *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014) (Title VII); *Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir. 2010) (NYSHRL).

Under the *McDonnell Douglas* framework, the plaintiff must establish a prima facie case. 411 U.S. at 802. To establish a prima facie case of either gender or age discrimination, a plaintiff must demonstrate that "(1) [they were] within the protected class; (2) [they were] qualified for the position; (3) [they were] subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination." *Liebowitz v. Cornell Univ.*, 584 F.3d 487, 498 (2d Cir. 2009).

The plaintiff's burden at this stage is "minimal" or "de minimis." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (describing burden for discrimination claims); *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005) (describing burden for retaliation claims). However, a plaintiff must establish all four elements of the prima facie case before

14

proceeding with the next step of the *McDonnell Douglas* framework. *See O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 311–12 (1996) ("As the very name 'prima facie case' suggests, there must be at least a logical connection between each element of the prima facie case and the illegal discrimination for which it establishes a 'legally mandatory, rebuttable presumption[.]'" (citations omitted)).

Once a plaintiff has made a prima facie case, the burden shifts to the employer to articulate a "legitimate, nondiscriminatory reason" for the employment action. *McDonnell Douglas*, 411 U.S. at 802. In other words, "[t]he defendant must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (internal quotation marks and emphasis omitted).

Upon the defendant's proffer of a non-discriminatory reason, the presumption of discrimination arising with the prima facie case "drops from the picture," *Weinstock*, 224 F.3d at 42 (citing *Hicks*, 509 U.S. at 510–11), and the "final and ultimate burden" then returns to the plaintiff to demonstrate that defendant's reason is in fact a pretext for unlawful discrimination. *See McDonnell Douglas*, 411 U.S. at 804; *Weinstock*, 224 F.3d at 42. The plaintiff must "produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not the discrimination was the real reason for the employment action." *Weinstock*, 224 F.3d at 42 (internal quotation marks omitted) (citation omitted).  Alternatively, a plaintiff may meet its final burden by relying on direct or indirect evidence demonstrating that "an impermissible reason was a motivating factor, without proving that the employer's proffered explanation played no role in its conduct." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 81 (2d Cir. 2001) (internal quotations

15

omitted). "In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination." *Weinstock*, 224 F.3d at 42.

In addition, regarding employment retaliation claims, Title VII protects "the filing of formal charges of discrimination . . . as well informal protests of discriminatory employment practices." *Littlejohn v. City of New York*, 795 F.3d 297, 317 (2d Cir. 2015) (quoting *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990)); *see Natofsky v. City of New York*, 921 F.3d 337, 354 (2d Cir. 2019) ("Protected activity is action taken to protest or oppose statutorily prohibited discrimination.") (quotation marks omitted).   A plaintiff bringing employment retaliation claims advances under the same *McDonnell Douglas* burden-shifting framework used for underlying discrimination claims.  *See Littlejohn*, 795 F.3d at 315 (Section 1981 and Title VII); *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013) (NYSHRL).  To state a prima facie retaliation claim under Section 1981, Title VII, and the NYSHRL, a plaintiff must show "(1) [plaintiff] engaged in a protected activity; (2) [the] employer was aware of this activity; (3) the employer took adverse employment action against [plaintiff]; and (4) a causal connection exists between the alleged adverse action and the protected activity."  *Summa*, 708 F.3d at 125 (Title VII and NYSHRL); *accord Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (Section 1981).  Section 1981 and Title VII claims "must be proved according to traditional principles of but-for causation, which requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  *Maynard v. Montefiore Med. Ctr.*, No. 18-CV-8877 (LAP), 2021 WL 396700, at *6 (S.D.N.Y. Feb. 4, 2021) (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013) and *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020)).  The same standard applies to

retaliation claims under the NYSHRL.  *Id.* (citing *Smith v. N.Y. & Presbyterian Hosp.*, 440 F. Supp. 3d 303, 340 n.22 (S.D.N.Y. 2020) (collecting cases)).

The Second Circuit has "repeatedly expressed the need for caution about granting summary judgment to an employer in a discrimination case where . . . the merits turn on a dispute as to the employer's intent.  At the same time, . . . the salutary purposes of summary judgment—avoiding protracted and harassing trials apply no less to discrimination cases than to other areas of litigation." *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015) (quotation marks, citations, and alterations omitted).  As in any other case, a plaintiff in an employment discrimination or retaliation case "must 'do more than simply show that there is some metaphysical doubt as to the material facts.'  She must come forth with evidence sufficient to allow a reasonable jury to find in her favor." *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)) (internal citations omitted).

## DISCUSSION

### I. Discrimination Claims (Counts I-III)

The Court first assesses whether Plaintiff has established a prima facie case of discrimination.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  Plaintiff alleges discrimination on the basis of his race and religion.[3]  (Am. Compl. at ¶¶ 119, 125, 133, 140, 145, 152.)  The parties dispute whether the Plaintiff was qualified to receive a promotion to PGY-3, whether Plaintiff's denial of promotion constituted an "adverse action," and whether the adverse

---

[3] Because Sikhism is a religion "developed specifically among the people hailing from the Punjab region of the Indian Subcontinent" (Plf. Opp. at 28), this Court construes Plaintiff's claims to encompass both race-based and religion-based discrimination.  *See Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987) (concluding Congress passed Section 1981 with the intent to "protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their *ancestry or ethnic characteristics*") (emphasis added).

17

action occurred under circumstances giving rise to an inference of discrimination on the basis of Plaintiff's race or religion.

This Court, however, need not resolve these disputes.  Instead, as Second Circuit caselaw "makes clear," this Court may simply assume that a plaintiff has established a prima facie case and skip to the final step in the *McDonnell Douglas* analysis, as long as the employer has articulated a legitimate, nondiscriminatory reason for the adverse employment action." *Howard v. MTA Metro-N. Commuter R.R.*, 866 F. Supp. 2d 196, 205 (S.D.N.Y. 2011) (collecting cases) (citing *Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 188 (2d Cir. 2006)).  The Court need not assess the credibility of the evidence proffered; it must decide whether defendants have "introduced evidence that, 'taken as true, would permit the conclusion that there was a nondiscriminatory reason.'" *See Lyons v. New York, Div. of Police*, No. 15 CIV. 3669 (NSR), 2020 WL 2857157, at *10 (S.D.N.Y. June 2, 2020), *on reconsideration in part sub nom. Lyons v. New York*, No. 15 CIV. 3669 (NSR), 2021 WL 1226957 (S.D.N.Y. Mar. 31, 2021).  Once defendants articulate a non-discriminatory reason, the burden shifts back to the plaintiff to demonstrate that the alleged reason for the adverse employment decision was pretextual.  *See Cooper v. Connecticut Public Defenders Office*, 280 Fed. Appx. 24, 25 (2d. Cir. 2008).

Defendants have plainly "articulated a legitimate, non-discriminatory reason" for denying Plaintiff promotion to PGY-3: Plaintiff's deficient clinical performance.  *Dixon v. Int'l Fed'n of Accts.*, 416 F. App'x 107, 110 (2d Cir. 2011) ("Even assuming *arguendo* that Dixon could establish a *prima facie* case, the record overwhelmingly demonstrates that IFAC had a legitimate, non-discriminatory reason for terminating Dixon—namely, her deficient work performance.").  The record is replete with documentation of Plaintiff's deficient clinical performance.  (*See, e.g.,* Keil Dec. Exs. 6, 7, 8, 9, 15, 16, 18, 19, 22, 30, 31, 32, 33, 34.)  Plaintiff received several negative

evaluations of his clinical performance from multiple instructors across a three-year period of time, with each evaluation addressing the same series of flaws: Plaintiff was unable to safely and independently apply his medical knowledge to appropriately diagnose and develop treatment plans for patients in a clinical setting.  (*See, e.g., id.*)  In sum, despite receiving additional supervision, Plaintiff failed to "concisely, clearly and accurately assess, treat, present and educate" his patients. (*See id.* at Ex. 34.)  The burden thus shifts to Plaintiff to show that Defendants' justification is pretextual.  *See McDonnell Douglas*, 411 U.S. at 804.

Plaintiff can do so "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Ibrahim v. N.Y. State Dep't of Health*, 904 F.2d 161, 166 (2d Cir. 1990). Plaintiff argues Defendants' claim of Plaintiff's deficient performance is pretext for two primary reasons: (1) Defendants' evaluation of Plaintiff's performance is "contradicted by [Defendants'] own faculty, residents, and appeals committee" (Plf. Opp. at 20–23); and (2) "[D]efendants repeatedly ignored their own program requirements and standards in both how they supervised and evaluated plaintiff" (*id.* at 24–26).[4]  The Court addresses each argument in turn.

Plaintiff first avers that the evaluations of faculty, fellow residents, and the Appeals Committee contradict Defendants' contention that Plaintiff exhibited deficient performance.  (*Id.* at 20–23.)  Plaintiff argues he received "outstanding reviews" from rotation faculty, which Plaintiff contends is important because residents "spend significantly more time in rotations than they do in the Open Door Clinic."  (*Id.* at 20.)  Defendants disregard this evidence, argues Plaintiff.  One

---

[4] Plaintiff also argues this Court must disregard testimony from Dr. Harkisoon and the Core Faculty.  (Plf. Opp. at 26–27.)  Although this Court does not rely upon their testimony, it also notes that considering the testimony of an "interested witness" does not necessarily preclude a grant of summary judgment, especially where that testimony is "uncontradicted and unimpeached."  *Chiaramonte v. Animal Med. Ctr.*, 677 F. App'x 689, 693 (2d Cir. 2017) (affirming grant of summary judgment even where lower court relied upon testimony of "interested witness").

example is the evaluation of Dr. Kovoor.  Dr. Kovoor supervised Plaintiff in an off-site family medicine rotation, and he reported to the CCC that Plaintiff "had performed well, met all the necessary competencies, and ought to be promoted to PGY-3."  (*Id.* at 21 (citing Second Kovoor Dec. Ex. B).)  Plaintiff also received positive feedback from attending physicians, senior residents, and his academic adviser.  (*Id.* at 21–22.)  In addition, Plaintiff took the National In-Training Examination in October 2016 and scored higher than any other resident in the Program that year. (*Id.* at 22.)  Lastly, Plaintiff contends Defendants' assessment of Plaintiff's performance was twice rejected by the Appeals Committee, which reinstated Plaintiff and directed Plaintiff to complete his residency under different supervision.  (*Id.* at 23.)

Although Plaintiff has demonstrated competency in several rotations outside of the Clinic, earned the respect of his peers, and achieved high marks in the National In-Training Examination, Plaintiff has failed to proffer evidence to support a finding that the various evaluations performed by Core Faculty members were uncredible, and more likely than not, that discrimination was the real reason for the poor assessments resulting in his subsequent failure to be promoted in the Program.  At the outset, the Appeals Committee found on November 23, 2016 that Plaintiff had "demonstrated deficiencies with regards to his PGY-2 performance" and "failed to meet expectations of the PGY-2 level of training."  (Keil Dec. Ex. 28.)  In its decision dated August 9, 2017, the Appeals Committee—contrary to Plaintiff's argument otherwise—did not back down from its prior findings.  Instead, the Committee explained that it found "[n]o *new* information" to "warrant . . . departure" from its prior ruling.  (*Id.* at Ex. 38 (emphasis added).)  Although the Committee found Plaintiff had shown "sufficient competency in numerous venues so as to

countervail the issues which previously arose," the Committee did not explicitly direct the CCC to promote Plaintiff to PGY-3.  (*Id.*)

Plaintiff's positive feedback and test scores are commendable, but they do not show Plaintiff's religion "more likely motivated the employer" to deny Plaintiff's promotion than other non-discriminatory reasons or that the CCC's evaluations of Plaintiff were "unworthy of credence."  *Ibrahim*, 904 F.2d at 166.  The positive feedback, at best, demonstrates (1) Plaintiff showed competencies in various Family Medicine specialty rotations; (2) Plaintiff possessed sufficient medical knowledge to execute well on a standardized test; and (3) some physicians, such as Dr. Kovoor,[5] and residents observed Plaintiff perform well in a clinical setting.  This feedback, however, does not undermine the CCC's reason for denying Plaintiff's promotion: in the judgment of the physicians tasked with daily supervising Plaintiff's clinical performance,[6] Plaintiff was unable "concisely, clearly and accurately assess, treat, present and educate" his patients.  (Keil Dec. Ex. 34.)  In other words, the CCC could not trust Plaintiff to *consistently* treat patients in a safe, independent, and timely manner commensurate with the expected performance of a PGY-3 resident.  At base, Plaintiff asks this Court to substitute its judgment for that of numerous faculty members—all of whom possess more experience in family medicine than this Court—who documented Plaintiff's performance deficiencies in numerous written evaluations over a period of three years.  *See, e.g., Abdel-Raouf v. Yale University*, 2015 WL 687440, at *3 (D.Conn. Feb. 18, 2015) (collecting cases) (noting "unusual character of a residency training program" and thus

---

[5] Dr. Johnny Kovoor is a family medicine practioner who supervised Plaintiff during a six-week offsite rotation.  Dr. Kovoor believed Plaintiff did an "outstanding job."  (Second Kovoor Dec. at ¶ 6.)

[6] The Program was not obligated to consult the evaluations of outside physicians, such as Dr. Kovoor.  As stated in Section VIII.5 of the Handbook, the "Program Director may, at his or her discretion, consult with outside faculty who interact to a significant extent with the resident."

acknowledging "judges and juries are singularly unequipped to review judgments about professional qualification"). This Court is without authority to do so.

Plaintiff next argues that Defendants "repeatedly ignored their own program requirements and standards in both how they supervised and evaluated plaintiff." (Plf. Opp. at 24.) Plaintiff observes that although "one of defendants' major criticisms of plaintiff's performance was that he was unable to safely see a sufficient number of patients in the clinic," Defendants gave Plaintiff "different instructions" as to how to use his time during patient visits. (*Id.*) Plaintiff also claims Defendants videotaped his patient visits "not for the purpose of assisting plaintiff, but rather to gather evidence against him." (*Id.* at 24–25) Lastly, Plaintiff contends Defendants "repeatedly violated the provisions" of the Program's handbook. (*Id.* at 25–26.) In particular, Plaintiff asserts (1) the Program "tried to terminate plaintiff on three separate occasions without giving the appropriate notice of termination" (*id.* at 25), (2) the Program denied Plaintiff academic credit for rotations he passed (*id.* at 26), and (3) the Program "refused to implement the decision of its own appeals committee" (*id.*). In sum, Plaintiff argues "these repeated violations of policy to the detriment of plaintiff were motivated by discrimination." (*Id.*)

These purported procedural deficiencies do not establish pretext because none of them show Plaintiff's religion "more likely motivated the employer" to deny Plaintiff's promotion than other non-discriminatory reasons or that the CCC's evaluations of Plaintiff were "unworthy of credence." *Ibrahim*, 904 F.2d at 166. Plaintiff was scheduled to see one patient per hour—the same time given to a PGY-1 resident—and the differing instructions of Core Faculty did not prevent Plaintiff from treating patients at that rate. (Second Bassi Dec. at ¶ 40.) Instead, different Core Faculty members simply had differing views on how Plaintiff could best use his time to meet two of Plaintiff's obligations: appropriately diagnosing patients and timely completing medical

22

notes.  (*Id.* at ¶¶ 40–41.)  Whether members of the Core Faculty gave different advice to Plaintiff is far afield from evidence of discrimination; if anything, Plaintiff's argument merely proves members of the Core Faculty took an interest in Plaintiff's education and suggested advice for improvement.

Plaintiff also distorts testimony related to videotaping.  Citing to the deposition of Richard McCarrick, NYMC's designated institutional officer, Plaintiff argues the Program "began taping because once plaintiff made a complaint of discrimination, recordings could be used as evidence of a 'consensus' of plaintiff's deficiencies."  (Plf. Opp. at 25 (citing McCarrick Tr. 97:14-98:20).) But Mr. McCarrick attested to something much different.   He testifies that every resident is videotaped for the purpose of training.  (McCarrick Tr. 97:6-10.)  In the case of Plaintiff, the videotapes served an additional purpose: providing a prophylactic layer of review to ensure Plaintiff's fate would not be determined "only by an individual supervisor" but rather "by some kind of consensus of additional faculty members."  (*Id.* at 97:20-98:2.)  In other words, although the purpose of the videotapes was to serve as an "educational tool" (*id.* at 97:6-10), in Plaintiff's case the videotapes also served as a backstop for the CCC to ensure it did not make any decisions regarding Plaintiff's future without appropriate documentary evidence.  If anything, the videotapes show Defendants were concerned with making unanimous, evaluative decisions based only on credible, documented evidence and not the "opinion of a single supervisor."  (*Id.* at 98:15-20.)

Plaintiff also fails to establish the Program "repeatedly violated the provisions of its own handbook."  (Plf. at 25.)  Contrary to Plaintiff's argument, Plaintiff was notified on November 13, 2015 that the Program might not promote Plaintiff to PGY-3 (Keil Dec. Ex. 10)—well before the February 1st deadline purportedly required by the Resident Handbook—and the Program thrice extended Plaintiff additional time (first to February 2016, second to April, and third to June) to

23

show improvement prior to the termination of his tenure. (*Id.* at Exs. 11, 17, 23.)  Plaintiff was given similar notice the next year. (*Id.* at Exs. 26, 29.)  On December 19, 2016, the CCC accepted the ruling of the Appeals Committee to reinstate Plaintiff as PGY-2, and in doing so, it notified Plaintiff that the Program might not promote Plaintiff to PGY-3 should Plaintiff not show improvement by the time of his March 2017 evaluation. (*Id.* at Ex. 29.)  During the 2015–16 and 2016–17 school years, the Program put Plaintiff on clear notice that the Program would deny Plaintiff promotion to PGY-3 should he fail to meet performance expectations by a specified date (April 2016 and March 2017, respectively). (*Id.* at Exs. 17, 29.)  To the extent Plaintiff did not know *with certainty* by February 1st that the Program would deny him promotion, Plaintiff was receiving the benefit of additional time beyond February 1st to earn promotion.  Far from establishing pretext, Plaintiff's argument shows Defendants afforded greater notice than required by the Resident Handbook.

Plaintiff likewise cannot show Defendants' denial of credit evinces discriminatory intent or otherwise renders uncredible Defendants' evaluations of Plaintiff.  Plaintiff again refers to the Resident Handbook, this time to attempt to establish that he is entitled to credit for rotations successfully completed. (Plf. Opp. at 26.)  The Resident Handbook outlines the minimum performance metrics a resident must obtain to achieve promotion. (Handbook at Sec. VIII.2.)  To that end, the Handbook requires residents to successfully complete rotations and undergo remediation with respect to any unsuccessful rotations. (*Id.*)  The Handbook, however, does not entitle Plaintiff to "credit" for successfully completed rotations; in fact, "credit" is a word nowhere to be found in Section VIII of the Handbook. (*See generally id.* at Sec. VIII.)  Whether Plaintiff receives "credit" for a successfully completed course is an academic determination, and the CCC determined—based on the evaluations of several different physicians across three years—that

24

Plaintiff did not possess the competencies necessary for promotion to PGY-3.  *See, e.g., Abdel-Raouf*, 2015 WL 687440, at *3.  By granting Plaintiff some credit for PGY-2, Defendants were, in effect, making an academic determination as to how far Plaintiff was from being promoted to PGY-3: Plaintiff had not successfully completed PGY-2, but Plaintiff still demonstrated some competency in particular areas so as to not require him to repeat all of the PGY-2 rotations again. (*See, e.g.,* First Bassi Dec. Ex. V (May 9, 2017 email from S. Harkisoon to L. Muse: "[H]ow many months would the CCC say Dr. Bassi requires to achieve PGY-3 level performance in ambulatory medicine – let this guide how much credit he can receive for PGY-2.  Based on experience, would he need an entire year, potentially more or less?").)  Even if Defendants incorrectly denied Plaintiff credit, Plaintiff has offered no evidence to suggest Defendants were motivated by any intent other than to accurately assess how much training Plaintiff needed to achieve promotion to PGY-3. Indeed, if Defendants were motivated by discriminatory intent, one would expect Defendants to have denied Plaintiff credit entirely.

Defendants' alleged refusal to implement the decision of the Appeals Committee does not establish pretext either.  That is because the Appeals Committee was "charged with determining the validity of [Plaintiff's] termination" (First Bassi Dec. at Ex. R), and Plaintiff has produced no evidence to suggest the Committee reinstated Plaintiff at PGY-3 or otherwise directed the CCC's decision to place Plaintiff on probation upon reinstatement.  The plain language of the Committee's decision merely overrules the CCC's termination of Plaintiff's residency and permits Plaintiff to continue his training under the supervision of new faculty with the possibility that he would improve in areas of deficiency.  (Keil Dec. Ex. 43.)  Nothing in the record suggests the Program disregarded the decision of the Appeals Committee, let alone did so with discriminatory intent. *See Bourara v. New York Hotel Trades Council & Hotel Ass'n of New York City, Inc. Emp. Benefit*

*Funds*, No. 17CV7895 (DF), 2020 WL 5209779, at *12–13 (S.D.N.Y. Sept. 1, 2020), aff'd, No. 20-3092, 2021 WL 4851384 (2d Cir. Oct. 19, 2021) (finding no evidence of pretext where defendant allegedly "failed to follow its own policies and procedures in terminating [plaintiff's] employment" because plaintiff could not show "application of the policy was a pretext for discrimination").

Accordingly, this Court finds no genuine dispute of material fact exists: Plaintiff fails to demonstrate that Defendants' legitimate, non-discriminatory reasons for denying him promotion were pretextual. Accordingly, the Court dismisses with prejudice Plaintiff's discrimination claims (Counts I–III).

## II.     Retaliation Claims (Counts I, II, IV)

Like the discrimination claims addressed above, this Court begins by asking whether Plaintiff has established a prima facie case. As previously discussed, to state a prima facie retaliation claim under Section 1981, Title VII, and the NYSHRL, a plaintiff must show "(1) [plaintiff] engaged in a protected activity; (2) [the] employer was aware of this activity; (3) the employer took adverse employment action against [plaintiff]; and (4) a causal connection exists between the alleged adverse action and the protected activity." *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013) (Title VII and NYSHRL); *accord Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (Section 1981).

Here, the Court finds that Plaintiff has failed to demonstrate a causal connection between the alleged adverse action and protected activity. The evidence demonstrates that Defendants denied Plaintiff promotion to PGY-3 based on the unanimous decisions of the CCC. (Phelps 56.1 at ¶ 97.) Plaintiff counters that Dr. Puthiyamadam, Plaintiff's one-time adviser, "never rated Bassi below 'good' in her evaluations." (Plf. Resp. 56.1 Phelps at ¶ 97.) Plaintiff also avers that "[t]here

is no evidence of how decisions by the CCC are reached, and the CCC lacks minutes or records of meetings that would demonstrate its process."  (*Id.*)  Plaintiff, however, neglects evidence suggesting Dr. Puthiyamadam had reservations about Plaintiff's clinical performance.  (Keil Dec. Ex. 22 (March 2016 Summative Evaluation, authored by Dr. Puthiyamadam: "Dr. Bassi has not demonstrated improvement at the expected level.  Despite multiple one on one precepting sessions as well as specific written feedback[,] little improvement [is] noted.  There is now a concern that he is not competent to see patients independently.").)  Plaintiff also neglects that the burden, albeit "de minimis," rests with him to establish his prima facie case.  *See Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005).  Barring evidence that Defendants improperly withheld their meeting records, the non-existence of such records does not create a genuine dispute of material fact.  Instead, the evidence in the record cuts one way: not only did the CCC identify Plaintiff's performance deficiencies several months before his complaint to HR, but also the CCC's post-complaint decisions were unanimous and no evidence was presented to suggest members of the CCC discussed the HR complaint.  *See Abdel-Raouf v. Yale Univ.*, No. 3:12CV776 HBF, 2015 WL 687440, at *5 (D. Conn. Feb. 18, 2015) (citing *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)) (finding no retaliation where no evidence existed to suggest members of residency program evaluation committee "discussed [the derogatory comment] at the [evaluation] meetings"); *see also Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) (finding no retaliation where "extensive period of progressive discipline" began five months before filing EEOC charges).  Plaintiff fails to establish a causal

connection between his complaint to HR and subsequent denial of a promotion, and thus he fails to establish a prima facie case of retaliation.

Assuming, *arguendo*, that Plaintiff has established a prima facie case of retaliation, dismissal of the claims is still warranted. As discussed, Defendants offered legitimate, non-discriminatory reasons for denying Plaintiff's promotion, and no showing has been made by Plaintiff to establish pretext or that Plaintiff's complaint to HR was the "but-for" cause of the denial of promotion. *See, e.g., Palencar v. New York Power Auth.*, 834 F. App'x 647, 651 (2d Cir. 2020) (affirming, first, lower court's grant of summary judgment on discrimination claim because defendant had presented unrebutted legitimate, non-discriminatory reasons for adverse actions, and then summarily affirming, second, lower court's grant of summary judgment on retaliation claim because, "as noted above with respect to [plaintiff's] discrimination claims, even if we assume that [plaintiff] has established a prima facie case of retaliation, there can be no question that [defendant] proffered legitimate, non-retaliatory reasons for disciplining and ultimately terminating him"); *see also Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 70–73 (2d Cir. 2015) (affirming lower court grant of summary judgment where plaintiff failed to present sufficient evidence from which a reasonable jury could conclude "that the desire to retaliate was the but-for-cause") (quoting *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013)).

Accordingly, this Court dismisses with prejudice Plaintiff's retaliation claims (Counts I, II, IV).

### III.   Individual Liability (Counts V & VI)

Because this Court has found Plaintiff's underlying discrimination and retaliation claims do not withstand summary judgment, individual liability does not attach to Defendant Harkinsoon. *See, e.g., Falchenberg v. New York State Dep't of Educ.*, 338 F. App'x 11, 14 (2d Cir. 2009)

(dismissing individual liability claims arising under federal and state discrimination statutes, including NYSHRL, because "there was no underlying violation" and "aiding and abetting is only a viable theory where an underlying violation has taken place").

Accordingly, this Court dismisses with prejudice Plaintiff's individual liability claims (Counts V & VI).

## IV.     Breach of Contract (Count VII)

At the outset, Plaintiff's breach of contract claim against NYMC is dismissed with prejudice because NYMC is not a party to the contract at issue.[7] *See, e.g., 1911 Richmond Ave. Assocs., LLC v. G.L.G. Capitol, LLC*, 933 N.Y.S.2d 899, 899 (App. Div. 2nd Dep't 2011) (affirming grant of summary judgment where moving party was not party to contract and "thus owed no contractual duty to the plaintiff").

Turning now to Plaintiff's remaining breach of contract claim against Phelps, Plaintiff claims Phelps breached the Contract by (1) "[f]ailing to give Dr. Bassi timely notification of non-promotion"; (2) "[f]ailing to give Dr. Bassi timely notification of non-renewal"; (3) "[w]ithholding academic credit for rotations that Dr. Bassi successfully passed"; (4) "[d]enying Dr. Bassi due process with respect to his non-promotion, non-renewal, appeal, and receipt of academic credit"; (5) "[i]nterfering with the deliberations and decision of the Appeals Committee"; and (6) "[r]efusing to implement either the original or improperly modified decision of the Appeals Committee." (Am. Compl. at ¶ 160.)

For the reasons stated above, *supra* Discussion § I, and more, Plaintiff cannot recover for breach of contract because he does not raise a genuine dispute of material fact as to whether Phelps breached its obligations under the Contract (and Handbook). *See, e.g., 34-06 73, LLC v. Seneca*

---

[7] (*See* NYMC's Statement of Material Facts in Opposition to Plaintiff's Motion for Summary Judgment at ¶¶ 89–90, ECF No. 120 (citing Residency Agreement).)

*Ins. Co.*, 39 N.Y.3d 44, 52 (2022) (listing elements of a breach of contract claim: (1) "a contract exists," (2) "plaintiff performed in accordance with the contract," (3) "defendant breached its contractual obligations," and (4) "defendant's breach resulted in damages"). At base, Plaintiff was timely notified of non-promotion and non-renewal.[8]  He was notified on November 13, 2015— well before the February 1, 2016 deadline—that the Program might not promote him to PGY-3 unless he successfully completed steps outlined in his academic action plan.  (Keil Dec. Ex. 10.) Plaintiff's opportunity to show progress in his remediation was extended from December 2015 to February 2016 (*id.* at Ex. 11), from February 2016 to April 2016 (*id.* at Ex. 17), and again from April 2016 to June 2016 (*id.* at Ex. 23).  Taking Section VIII in isolation—as Plaintiff suggests we do—the contractual language contemplates that even an *already promoted* student may be subsequently denied promotion after February 1 for failure to meet "minimum training standards." These residents would *then* be subject to remediation procedures, as governed by Section VIII.4. Because these residents would face remediation after February 1, the "specified time frame" for completing remediation would necessarily occur after February 1.  A resident's failure to successfully complete remediation would thus result in the Program informing that resident of non-promotion after February 1.  Plaintiff is no different, except Plaintiff learned—*before* February 1—of his non-promotion and steps to cure.  Moreover, to the extent Phelps's notifications were indeed inadequate—and this Court finds they are not—Phelps nonetheless extended a benefit

---

[8] Plaintiff arguably was not entitled to any notice, let alone several months-worth.  Section VIII.5 of the Handbook governs "Termination."  This section states, "Termination will ordinarily become effective not less than two weeks after receipt of the written notice."  Moreover, this section allows the Program Director to waive the notification period if the "continuance of the resident in the program during the notice period would result in a risk of danger to patients."

to Plaintiff by allowing Plaintiff additional time beyond February 1 to cure his deficient performance.  (Keil Dec. Exs. 17, 23.)

Plaintiff's other alleged breaches are not well-taken.  As previously explained, nothing in the Agreement or Resident Handbook entitles Plaintiff to "credit" for completed rotations.  The award of credit is an academic determination, and this Court refuses to substitute its judgment for that of academic faculty.  *See, e.g., Abdel-Raouf*, 2015 WL 687440, at *3.  Although Plaintiff plainly completed his rotations, his performance was deemed unfit for promotion to PGY-3, and as such, the CCC determined—and the Appeals Committee did not disagree—that Plaintiff ought complete a number of PGY-2 rotations commensurate with the level of training the Program believed was necessary for promotion to PGY-3.  (First Bassi Dec. Ex. V; *accord* Keil Dec. Ex. 38.)  In other words, the Program did not award credit for rotations the CCC believed Plaintiff needed to retake to achieve the competencies necessary for promotion.  (First Bassi Dec. Ex. V.)

The record likewise confirms Plaintiff received precisely what he seeks: "participation in a residency where he and other residents had the ability to challenge adverse decisions."[9]  (Plf. Reply at 7.)    To the extent the Handbook guarantees Plaintiff the same "due process" that *government* institutions are constitutionally obligated to provide, *see, e.g., Gomes*, 365 F.Supp.2d at 35, Plaintiff has not shown a violation.  Plaintiff argues "the *ex parte* communications between Program representatives and the Appeals Committee resulted in a modified decision without Plaintiff's input" (Plf. Mem. at 16), but Plaintiff has not shown how these communications tainted the "integrity of the process and the fairness of the result."  *Gomes*, 365 F.Supp.2d at 35 (citation omitted).  At worst, Program representatives clarified to the Appeals Committee what is self-

---

[9] Plaintiff is correct that the Handbook guarantees "due process," but he does not articulate what "due process" guarantees Plaintiff in this context.  Phelps is not a government institution, and Plaintiff's cited cases involve purported violations of constitutional due process by state actors.  *See, e.g., Gomes v. University of Maine System*, 365 F.Supp.2d 6, 35 (D. Me. 2005).

31

evident: the Program could not guarantee Plaintiff placement in an outside program.  (Keil Dec. Ex. 40 (August 17, 2017 email from N. Janiga to S. Harkisoon, et al.: "The appeals committee understands that it does not have the ability to place Dr. Bassi outside this program.").)  Although Plaintiff argues the Program could have secured placement in another program (Plf. Reply at 9–10), he cannot show the Program had the authority to guarantee such placement.  Plaintiff cannot fault the Program for revising the terms of Plaintiff's reinstatement to remove a promise the Program had not the authority to guarantee.

Nor can Plaintiff suggest the appeals process generally denied him due process.  He received the benefits of the appeals process: the Appeals Committee twice overruled the CCC and reinstated Plaintiff.  (Keil Dec. Exs. 28, 38.)  Although Plaintiff is dismayed he was reinstated in PGY-2, he cannot point to anything in the Appeals Committee's decision to suggest he was in fact promoted to PGY-3.  Plaintiff argues that because the Committee found Plaintiff had "demonstrated sufficient competency in numerous venues so as to countervail the issues that previously arose," the decision "can only be read as a rejection of the CCC's determination that Plaintiff failed to meet sufficient competency" for promotion.  (Plf. Reply at 7–8 (quoting Keil Dec. Ex. 38).)  Plaintiff stretches the decision's language beyond its plain meaning.  The Appeals Committee addressed the CCC's decision to *terminate* Plaintiff—indeed, it reversed the CCC's decision—and it justified its reversal by concluding "[n]o new information was presented" to "warrant the committee's departure from its previous decision" "to reinstate Dr. Bassi."  (Keil Dec. Ex. 38.)  Put differently, the Committee found Plaintiff had "demonstrated sufficient competency" to "countervail the issues that previously arose," such that termination was inappropriate.  (*Id.*)  Plaintiff has produced no evidence to suggest the Program wrongly interpreted the Committee's decision.  This Court sees no evidence in the record, such as email correspondence with members

32

Case 7:19-cv-07542-NSR-AEK   Document 150   Filed 03/02/23   Page 33 of 34

of the Appeals Committee, to infer the Program wrongly interpreted the Committee's decision. Without more, this Court cannot second-guess the Program's decision to reinstate Plaintiff at a level the Program believed was commensurate with Plaintiff's training.[10]  *See, e.g., Abdel-Raouf*, 2015 WL 687440, at *3.

In sum, Plaintiff cannot establish a genuine dispute of material fact as to Phelps's alleged breaches.  Accordingly, this Court dismisses with prejudice Plaintiff's breach of contract claim (Count VII).

## V.     Tortious Interference with Contract (Count VIII)

Plaintiff asserts a claim for tortious interference with contract against NYMC.   To successfully prove his claim, Dr. Bassi must show (1) "the existence of a valid contract between [Dr. Bassi] and some third party"; (2) "knowledge of that contract by [NYMC]"; (3) "[NYMC's] intentional inducement of a breach by the third party to the contract"; and (4) "damages to [Dr. Bassi] as a result of the third party's breach."  *Action Nissan, Inc. v. Nissan N. Am.*, 454 F. Supp. 2d 108, 132 (S.D.N.Y. 2006); *accord Kronos, Inc. v. AVX Corp.*, 81 N.Y.2d 90, 94 (1993) ("The tort of inducement of breach of contract . . . consists of four elements: (1) the existence of a contract between plaintiff and a third party; (2) defendant's knowledge of the contract; (3) defendant's intentional inducement of the third party to breach or otherwise render performance impossible; and (4) damages to plaintiff.").

Because Plaintiff cannot prove an underlying breach of contract, Plaintiff's tortious interference with contract claim must fail.  *See D'Andrea v. Rafla-Demetrious*, 146 F.3d 63, 66

---

[10] Unfortunately, Plaintiff did not exhaust the appeal and grievance procedures in the Handbook—the same procedures that twice worked in Plaintiff's favor—to enforce the purported terms of the Committee's decision.  Had Plaintiff exhausted these procedures and challenged his reinstatement at PGY-2 (*see* First Bassi Dec. Ex. X (October 16, 2017 letter from K. Murray to H. Bassi: "If you wish to challenge the denial of academic credit or the [CCC's] decision to place you on a new academic probation plan upon your reinstatement, you must do so in accordance with the House Staff Rules & Procedures.")), he may have again won his appeal or, at the very least, obtained evidence to help him meet his burden of production in the present action.

33

Case 7:19-cv-07542-NSR-AEK   Document 150   Filed 03/02/23   Page 34 of 34

(2d Cir. 1998) (affirming grant of summary judgment for tortious interference claim where lower court found no underlying breach of contract); *accord Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424 (1996) (affirming dismissal of tortious interference claim because "actual breach of contract" is an element of the claim and plaintiff failed to allege third party "in fact breached its contract").

Accordingly, this Court dismisses with prejudice Plaintiff's tortious interference with contract claim (Count VIII).

## CONCLUSION

Defendants' motions for summary judgment are GRANTED.

Plaintiff's cross-motion for summary judgment is DENIED.

Plaintiff's claims are dismissed with prejudice.

The Clerk of Court is kindly directed to terminate the motions at ECF Nos. 100, 104, 107 and 111. The Clerk of Court is also directed to enter judgment in favor of the Defendants. The Clerk of Court is further directed to close the case.

Dated:   March 2, 2023                          SO ORDERED:
         White Plains, New York

                                         _____
                                         NELSON S. ROMÁN
                                         United States District Judge

34

**[SPA-35]**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------X
HARMEETINDER BASSI, M.D.,

                          Plaintiff,

          -against-                                                    19 **CIVIL** 7542 (NSR)

                                                                       <u>**JUDGMENT**</u>

NEW YORK MEDICAL COLLEGE, PHELPS
MEMORIAL HOSPITAL ASSOCIATION, d/b/a
PHELPS HOSPITAL, NORTHWELL HEALTH,
INC. d/b/a OPEN DOOR FAMILY MEDICAL
GROUP, and SHANTIE HARKISOON, M.D.,

                          Defendant.
----------------------------------------------------------X

          It is hereby **ORDERED, ADJUDGED AND DECREED:** That for the reasons

stated in the Court's Opinion & Order dated March 2, 2023, Defendants' motions for summary

judgment are GRANTED. Plaintiff's cross-motion for summary judgment is DENIED. Plaintiff's

claims are dismissed with prejudice; accordingly, the case is closed.

**Dated:** New York, New York

          March 2, 2023

                                                       **RUBY J. KRAJICK**

                                                 _____
                                                       **Clerk of Court**

                                    **BY:**      *K. Mango*
                                                 _____
                                                       **Deputy Clerk**