# 23-278

## United States Court of Appeals
## for the Second Circuit

HARMEETINDER BASSI, M.D.,

*Plaintiff-Appellant,*

v.

NEW YORK MEDICAL COLLEGE, PHELPS MEMORIAL
HOSPITAL ASSOCIATION, DBA PHELPS HOSPITAL, NORTHWELL
HEALTH, INC., OPEN DOOR FAMILY MEDICAL CENTER, INC.,
d/b/a OPEN DOOR FAMILY MEDICAL GROUP
and SHANTIE HARKISOON, M.D.,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT,
SOUTHERN DISTRICT OF NEW YORK

## REPLY BRIEF FOR PLAINTIFF-APPELLANT

LAW OFFICES OF JOSHUA PARKHURST
*Attorneys for Plaintiff-Appellant*
11 Broadway, Suite 615
New York, New York 10004
(201) 577-2644
jparkhurst@parkhurstlawfirm.com

**1613**

# <u>TABLE OF CONTENTS</u>

*Page*

PRELIMINARY STATEMENT.................................................................................1

POINT I.

BASSI WAS SUBJECT TO ADVERSE EMPLOYMENT
ACTIONS ...........................................................................................................1

POINT II.

APPELLEES MISAPPLY THE McDONNELL-DOUGLAS
PARADIGM AS IT RELATES TO SUMMARY JUDGMENT..............................3

    A. Appellees Proffer Does Not Give Them A Prima Facie
    Entitlement To Judgment As A Matter Of Law ................................................3

    B. Appellant May Present Direct or Pretext Proof of
    Discrimination Or Retaliation ........................................................................5

POINT III.

BASSI SUBMITTED EVIDENCE FROM WHICH A JURY
COULD DETERMINE THAT APPELLEES DISCRIMINATED
AND/OR RETALIATED AGAINST HIM ..............................................................8

    A. Bassi's Evidence Contradicting The Core Faculty's
    Assessment of Poor Performance Is Probative As Pretext
    Evidence.........................................................................................................9

    B. Bassi Has Submitted Probative Comparator Evidence .................................11

    C. Other Acts Demonstrating Retaliation Are Probative ..................................13

    D. Comments Regarding Bassi's Patka And His Complaint
    Against The Core Faculty Are Probative.......................................................15

POINT IV.

BASSI IS ENTITLED TO SUMMARY JUDGMENT ON HIS
CLAIM FOR BREACH OF CONTRACT ............................................................18

    A. Appellees Misstate Both The Ruling of The Appeals
       Committee And The Program's Guidelines For Awarding
       Credit For Rotations ...................................................................................18

    B. Bassi Failed To Receive Timely Notice And Due Process...........................22

POINT V.

BASSI HAS PRESENTED EVIDENCE IN SUPPORT OF
CONSTRUCTIVE DISCHARGE ...........................................................................23

POINT VI.

BASSI HAS ASSERTED CLAIMS AGAINST NYMC AS AN
EMPLOYER AND AS A PARTY TO THE CONTRACT .....................................27

CONCLUSION ......................................................................................................30

CERTIFICATE OF COMPLIANCE ......................................................................31

# <u>TABLE OF AUTHORITIES</u>

*Page(s)*

**Cases:**

*Arculeo v. On-Site Sales & Marketing, LLC,*
  425 F.3d 193 (2d Cir. 2005)........................................................27, 28

*Boakye-Yiadom v. Laria,*
  2013 U.S. Dist. LEXIS 86624 (EDNY 2013)....................................6

*Carter v Syracuse City Sch. Dist.,*
  2016 U.S. App. LEXIS 12870 (2d Cir July 11, 2016).......................1

*Chiaramonte v. Animal Med. Ctr.,*
  677 F.Appx 689 (2d. Cir, 2017)........................................................5

*Cronin v. Aetna Life Ins. Co.,*
  46 F.3d, 203 (2d Cir. 1995)............................................................3, 6

*Desert Palace v. Costa,*
  539 U.S. 90 (2003)...........................................................................7

*Echevarria v. Insight Med., P.C.,*
  72 F. Supp. 3d 442 (SDNY 2014)...................................................28

*Fitzgerald v. Henderson,*
  251 F.3d 345 (2d Cir. 2001).............................................................1

*Graham v. Long Island R.R.,*
  230 F.3d 34 (2d Cir. 2000).............................................................11

*Gronowski v. Spencer,*
  424 F.3d 285 (2d Cir. 2005).............................................................4

*Halbrook v. Reichhold Chemicals, Inc.,*
  735 F. Supp. 121 (S.D.N.Y. 1990).................................................25

*Hester v. BIC Corp.,*
  225 F.3d 178 (2d Cir. 2000)...........................................................12

*Kallinikos v NY State Dept. of Corr. & Community Supervision,*
2019 US Dist LEXIS 119064 (EDNY July 16, 2019) ....................................... 1

*Medeiros v Pratt & Whitney Power Sys.,*
272 F App'x 78 (2d. Cir 2008) ......................................................................... 10

*Morrison v. Johnson,*
429 F.3d 48 (2d Cir. 2005) ........................................................................ 23-24

*Pena v. Brattleboro Retreat,*
702 F.2d 322 (2d Cir. 1983) ............................................................................. 25

*Price Waterhouse v. Hopkins,*
490 U.S. 228 (1989) ............................................................................................ 7

*Reeves v. Sanderson Plumbing Prods.,*
530 U.S. 133 (2000) ............................................................................................ 4

*Saulpaugh v. Monroe Cmty. Hosp.,*
4 F.3d 134 (2d Cir 1993) ................................................................................. 13

*Sprint/United Mgmt. Co. v. Mendelsohn,*
552 U.S. 379 (2008) .......................................................................................... 13

*St. Mary's Honor Ctr. v. Hicks,*
509 U.S. 502 (1993) ............................................................................................ 6

*Stern v. Trustees of Columbia Univ.,*
131 F.3d 305 (2d Cir. 1997) ............................................................................. 10

*Sutera v Schering Corp.,*
73 F3d 13 (2d Cir 1995) ..................................................................................... 6

*Tex. Dep't of Cmty. Affairs v. Burdine,*
450 U.S. 248 (1981) ................................................................................. 6, 7, 17

*Tinsley v City of Charlotte,*
2021 U.S. App. LEXIS 13386 (4th Cir May 5, 2021) ...................................... 11

iv

*United States Postal Service v. Aikens,*
    406 U.S. 711 (1983) ...............................................................................6

*United States v. Bari,*
    599 F.3d 176 (2d Cir. 2010)................................................................24

*United States v. Brown,*
    348 F.3d 1200 (10th Cir. 2003).........................................................24

*Whidbee v. Garzarelli Food Specialties, Inc.,*
    223 F.3d 62 (2d Cir. 2000)..................................................................25

**Rules, Laws & Statutes:**

Fed R. App. 28 ......................................................................................31

Fed R. App. 32 ......................................................................................31

Local Rule 32.1 .....................................................................................31

## PRELIMINARY STATEMENT

Appellant Harmeetinder Bassi, M.D. ("Bassi") respectfully submits this Reply Brief in response to the Briefs of the Appellees.

## POINT I.

## BASSI WAS SUBJECT TO ADVERSE EMPLOYMENT ACTIONS

Appellees claim Bassi did not suffer an adverse employment action. Hospital Defendants Brief p. 18, Open Door Brief p. 19. This is incorrect. The failure to promote Bassi constitutes an adverse employment action. In addition to being a necessary step to complete the residency, each promotion comes with an increased salary. JA-1246-1247. "It is beyond cavil that a 'loss of income' qualifies as an adverse employment action, as does an employer's failure to promote." *Carter v Syracuse City Sch. Dist.*, 2016 U.S. App. LEXIS 12870, at *6 (2d Cir July 11, 2016, No. 152395). Moreover, Bassi has alleged a constructive discharge from the Program, which constitutes an adverse employment action. *Fitzgerald v. Henderson*, 251 F.3d 345, 357 (2d Cir. 2001).

Although not every reprimand or letter to file is considered to be an adverse employment action, one is considered to be adverse if it results in a change in the terms and conditions of employment. *See Kallinikos v NY State Dept. of Corr. & Community Supervision*, 2019 US Dist LEXIS 119064, at *17-18 (EDNY July 16, 2019, No. 19-cv-331 (BMC)) ("District courts within the Second Circuit have often

1

found that reprimands, threats of disciplinary action, and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay *or being placed on probation*.") (emphasis in original).

In this case, the complained of acts were not simply letters to a file without consequence; rather, they subjected Bassi to different treatment throughout the residency, and ultimately prevented him from completing his residency. Bassi's remediation and probation plans limited the number of patients he could see. He was strictly held to requirements such as completing all medical notes in 24 hours, completing all learning modules, and having certain required procedures observed by the Core Faculty in order to obtain credit, while other residents had no such requirements.

Perhaps most important, the evaluations, remediation, and probation led to the failure to promote, attempted terminations of his residency, and the retroactive removing of credit for almost all rotations Bassi had successfully completed. Appellees cannot assert their actions against Bassi did not constitute "adverse employment actions," then rely on those same actions as justification for their later attempts to terminate him from the Program.

## POINT II.

## APPELLEES MISAPPLY THE McDONNELL-DOUGLAS PARADIGM AS IT RELATES TO SUMMARY JUDGMENT

Appellees make several errors in applying the McDonnell-Douglas burden shifting formula. As noted in Appellant's opening Brief, Bassi's claims in this case were not limited to "pretext" evidence. To the extent *McDonnell-Douglas* is applicable at all, however, Appellees take what is designed to allow for circumstantial and indirect proof in discrimination cases and instead improperly use it to avoid submitting sufficient proof of their own while also limiting relevant evidence submitted by Bassi.

### A. Appellees Proffer Does Not Give Them A Prima Facie Entitlement To Judgment As A Matter Of Law.

Appellees continue to conflate the burden of production under McDonnell-Douglas with their burden to demonstrate they are entitled to summary judgment. Appellees proffered a purported nondiscriminatory reason for their actions against Bassi, his alleged poor performance. That shifts the burden back to Bassi to prove discrimination, but does not mean the case can be resolved via summary judgment. As noted in Appellant's Brief at p. 21, this Court has recognized that proffering a legitimate nondiscriminatory reason can only result in summary judgment if that proffer, by itself, could not be rejected by any rational finder of fact. *Cronin v. Aetna Life Ins. Co.* 46 F.3d, 203 (2d Cir. 1995).

3

The Hospital Defendants argue that "Bassi attempts to disregard admissible evidence by baselessly impugning the credibility of witnesses." (Hospital Defendants Brief, p. 28). The question, however, is not whether the witness testimony is admissible, but whether it is sufficient to grant Appellees judgment as a matter of law. They claim Appellant misquotes *Reeves v. Sanderson Plumbing Products* when Appellant's brief quotes *Reeves* verbatim. Specifically, the opinion states "That is, the court should give credence to the evidence favoring the nonmovant as well as that "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 151 (2000). This Court has held in *Gronowski v. Spencer*, 424 F.3d 285, 292 (2d Cir. 2005), in evaluating a motion for judgment as a matter of law "we review the entire record, we cannot consider evidence favorable to appellant that the jury need not have believed. That is, we must disregard contradicted evidence and testimony from impeached and interested witnesses that supports appellants." *citing Reeves*.[1]

Appellees submission in this case demonstrates why merely proffering a legitimate nondiscriminatory reason does not necessarily warrant summary judgment. Most of the evidence relied upon by Appellees, and cited in support of

---

[1] "[The] standard for granting summary judgment "mirrors" the standard for judgment as a matter of law, such that "the inquiry under each is the same." *Reeves* 530 U.S. at 150.

their motion, came through Exhibits 1-52 of an attorney declaration, with a foundation of no more than "selected documents exchanged between the parties in fulfillment of their discovery obligations in this matter." JA-253 ¶12. Although these contained various evaluations and correspondence of the Core Faculty/CCC whose decision is at issue in this case, there was no testimony or other foundation confirming that these evaluations were either accurate or the actual reasons for refusing to advance Bassi in the Program. When questioned at deposition, Bassi was able to refute the criticisms in the evaluations. JA-1377-1383.

An interested witness may submit evidence in support of summary judgment, but to the extent that witness's submission relies on their own subjective evaluation or credibility to prove the legitimate nondiscriminatory reason, it is not sufficient to obtain summary judgment. *Chiaramonte v. Animal Med. Ctr.*, 677 F.Appx 689 (2d. Cir 2017). Thus, while Appellees may have submitted evidence in support of their purported legitimate non-discriminatory reason, a jury would not be compelled to agree with the assertions and conclusions in those evaluations, just as they could reject the testimony if the Core Faculty testified as to those evaluations at trial.

**B. Appellant May Present Direct or Pretext Proof of Discrimination Or Retaliation**

Appellees also misstate Bassi's burden once they have proffered their purported legitimate nondiscriminatory reason. The Hospital Defendants frame the issue as whether Bassi proved that he met the milestones required to advance in the

5

Program. (Hospital Defendants Brief, p. 23). The Supreme Court has cautioned lower courts, however, the ultimate question in any employment discrimination case is discrimination *vel non*. *United States Postal Service v. Aikens*, 406 U.S. 711, 714. (1983).

Bassi "…may succeed in this either <u>directly</u> by persuading the court that a discriminatory reason more likely motivated the employer or <u>indirectly</u> by showing that the employer's proffered explanation is unworthy of credence." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 2564 (1981) (emphasis added). Proving the employer's proffered reason false permits, but does not require, a finder of fact to determine that discrimination was the real reason for the action. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993) ("Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination, and the Court of Appeals was correct when it noted that, upon such rejection, "no additional proof of discrimination is *required*…") (emphasis in original). This Court has held that "the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors." *Sutera v Schering Corp.*, 73 F3d 13, 17 (2d Cir 1995); *Cronin*, 46 F.3d at 203. *See also Boakye-Yiadom v. Laria*, 2013 U.S. Dist. LEXIS 86624, *7-9 (EDNY 2013) ("Even if, contrary to the fact, there were

uncontested performance issues identified by Laria in the September 2008 performance evaluation, such a finding would not be dispositive of defendants' motion for summary judgment."). Bassi's evidence of discrimination and retaliation, along with demonstrating that Appellees' explanations are incorrect, inconsistent and/or incomplete, can be used by a jury to find that Appellees discriminated and/or retaliated against Bassi based on prohibited factors.[2]

---

[2] The Hospital Defendants claim "direct evidence" means smoking gun type evidence from which no inference has to be made for a finding of discrimination. Hospital Defendants Brief pp. 30-31. That term was used by Justice O'Connor in her concurrence in *Price Waterhouse v. Hopkins* to describe a particular form of evidence that would shift the burden of proof to defendant to show it would have taken the same adverse action against plaintiff even in the absence of discrimination. 490 U.S. 228, 270-278 (1989) (discussion of need for "direct evidence" to shift burden of proof to defendant). The use of "direct evidence" in that sense, however, is largely irrelevant since the Supreme Court's decision in *Desert Palace v. Costa*, 539 U.S. 90 (2003) (holding that plaintiff may either use "direct" or "circumstantial" evidence to obtain a mixed-motive determination). Bassi uses the term as it was used in *Burdine*, in that evidence such as calling him a "thug" for wearing his patka, or firsthand observation by residents and faculty of differential treatment is directly probative of discrimination, regardless of the employer's proffered reasons for its actions. Similarly, Puthiyamadam's statement that "you just made matters worse for yourself" is probative of retaliation, regardless of any particular reason offered by Appellee.

**POINT III.**

**BASSI SUBMITTED EVIDENCE FROM WHICH A
JURY COULD DETERMINE THAT APPELLEES
DISCRIMINATED AND/OR RETALIATED AGAINST HIM**

Even if the subjective (and as noted, unsworn, except as through an attorney declaration) evaluations and otherwise negative comments about Bassi by Harkisoon and the Core Faculty were sufficient for purposes of summary judgment, they have been contested and contradicted by Bassi's submissions. Bassi submitted, in addition to his own declaration with specific allegations and documents, six declarations from disinterested witnesses. Bassi also submitted voluminous evidence demonstrating that his performance in both rotations and the clinic (when not precepted by Harkisoon or Core Faculty) was satisfactory, and objective indicators such as the highest score on the National In Training Examination of all three classes in the residency. Bassi also submitted the Program's own evaluation of Harkisoon, which concluded that she "lacks honesty and is often not forthcoming" and ran a Program where there was "…a common theme of favoritism, fear of retaliation and the lack of comfort to bring up concerns without retribution…" SA-32.

Appellees try to downplay these submissions by treating each piece of evidence in piecemeal fashion, consistently offering the most innocuous inferences

from such evidence, and misapplying caselaw as to what is probative of discrimination.

## A. Bassi's Evidence Contradicting The Core Faculty's Assessment of Poor Performance Is Probative As Pretext Evidence.

The Hospital Defendants claim that their evidence of poor performance was "unrebutted." To the contrary, Bassi did not simply rely on his own opinion or make conclusory assertions, but provided objective evidence of strong performance, including:

- Three residents who testified not only that Bassi performed well, but that they directly observed the faculty evaluate him more harshly than any other resident. JA-1492-1505.

- Former faculty member Kaul averring that Harkisoon and the Core Faculty were treating Bassi more harshly as early as the PGY-1 year. She also contradicted Harkisoon's sworn testimony that Kaul had "grave concerns" about Bassi. Kaul denied having such concerns and in fact notified Harkisoon that Bassi was performing at the appropriate level. JA-1484-1490.

- The former chair of the Program's Graduate Medical Education Committee who averred that several other practicing physicians in the Program observed differential treatment of Bassi, that he raised concerns as to whether Harkisoon and the CCC were providing Bassi with due process, and that they failed to allow the GMEC to vote on Bassi's non-promotion. JA-1070-1071.

- Another faculty member, Johnny Kovoor, who supervised Bassi on a rotation specifically approved by Harkisoon. Kovoor determined Bassi had met the required milestones and advised Harkisoon of same, only to have his evaluation disregarded because Harkisoon claimed the rotation was not properly designed, even though she approved it. JA-1470-1482

- The overwhelmingly positive evaluations from rotation supervisors, hospitalists, and clinic preceptors other than Core Faculty, as well as objective assessments such as Bassi's performance on the National In Training Examination that all contradict Harkisoon and the Core Faculty/CCC as discussed in pp. 27-31 of Appellant's Brief.

- The departures from normal procedure as well as contradictory directives given by the faculty as discussed in pp. 36-41 of Appellant's Brief.

- The Appeals Committee Decision of 2017 which rejected the CCC's determination and held that "Dr. Bassi has demonstrated sufficient competency in numerous venues so as to countervail the issues which previously arose." JA-212-213.

Appellees claim none of this is probative, because courts cannot second guess the academic judgment of the faculty. That is not the function of the evidence submitted by Bassi. Rather the evidence would allow a jury to decide that Harkisoon and the Core Faculty/CCC did <u>not</u> base their decision on actual academic judgment, but rather discriminated against Bassi on the basis of race and religion, and retaliated against him for complaining about the disparaging comments about his religious headwear. *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 313 (2d Cir. 1997) ("While we do not second-guess an employer's hiring standards, the reasons for its employment decision, including its alleged reliance on such standards, are subject to scrutiny under Title VII."). *See Medeiros v Pratt & Whitney Power Sys.*, 272 F App'x 78 (2d. Cir 2008) and cases cited at Appellant's Brief pp. 33-34.

10

## B. Bassi Has Submitted Probative Comparator Evidence

"Comparator evidence is 'particularly probative' in determining whether an adverse employment action was the result of discrimination, because such evidence allows the fact finder to make an objective inquiry and to control for other explanations for termination." See *Tinsley v City of Charlotte*, 2021 U.S. App. LEXIS 13386, at *13-14 (4th Cir May 5, 2021, No. 19-1871), *see also Graham v. Long Island R.R.*, 230 F.3d 34, 39-40 (2d Cir. 2000) (discussing relevance of comparator evidence). Whether such employees are similarly situated is normally a question of fact for the jury. *Graham* 230 F.3d at 39. Appellees claim no other resident is "similarly situated" because none were subject to additional supervision or exhibited performance deficiencies. This is incorrect. Bassi submitted evidence that other residents were placed on academic action plans and remediation during the same time period. SA-16-23. The Program itself recognized that one area of concern under Harkisoon was "Volatile Feedback – Unpredictable messages/feedback to staff and residents, moving them to "at risk" status and back again, creates fear and uncertainty among faculty and residents." SA-39. Even if no other resident had been placed on academic action plans or remediation, that raises whether those measures as applied to Bassi were based on discrimination and retaliation.

Appellees claim the first hand testimony of differential treatment is not probative because none of the witnesses said that the treatment was different due to Bassi's race or religion. They are neither required nor permitted to testify to that effect. This Court has held that lay witnesses may offer their observations as to differential treatment, but cannot opine on whether such differences were due to race. In *Hester v. BIC Corp.*, 225 F.3d 178 (2d Cir. 2000), defendant objected to testimony by four witnesses that the supervisor's condescending treatment of the plaintiff was because of the plaintiff's race. *Id.* at 181-84. This Court found it error for the witnesses to testify that they thought the supervisor was motivated by racial discrimination, but that "[w]itnesses are free to testify fully as to their own observations of the defendant's interactions with the plaintiff or other employees." *Id.* at 185. Thus, the Court stated that the witnesses could testify that the supervisor had treated the plaintiff with "(variously) condescension, coldness, hostility or disregard, as compared with" her treatment of plaintiff's white peers, and the jury could then draw its own conclusion as to motivation. *Id.*

The residents compared with Bassi were in the same Program, supervised by the same faculty, required to meet the same milestones, and under the same Program Director whom the Program determined used measures such as probation and remediation in an arbitrary and unpredictable manner. They are comparable in all material respects, and the first hand observations of differential treatment are

evidence that a reasonable jury can use to find discrimination and/or retaliation against Bassi.

## C. Other Acts Demonstrating Retaliation Are Probative

Appellees try to disclaim their own report concluding that the Program under Harkisoon retaliated against individuals who raised concerns about how the Program was run, and their own conclusion that Harkisoon lacks credibility. Appellees are incorrect when they claim that evidence of other acts of discrimination and/or retaliation are not admissible. In *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 388 (2008) the Supreme Court held such acts can be relevant and that a court must review such evidence for its probative versus prejudicial effects. Well before *Sprint*, this Court also recognized that acts of retaliation against other workers by the employer can be relevant. In *Saulpaugh v. Monroe Cmty. Hosp.*, 4 F.3d 134, 141 (2d Cir 1993), the plaintiff alleged she had been subject to sexual harassment and retaliation by her employer, and at trial provided the testimony of another employee who was subject to such harassment and retaliation. This Court found that the plaintiff "…in effect produced not one but two 'smoking guns.' Therefore, we find that plaintiff unquestionably satisfied her burden of proving that she was discharged in retaliation for complaining about Rosemond's harassment."

The Hospital Defendants nevertheless claim that the evidence in their own report should not be admissible because it refers to "complaints against Harkisoon

three years after Bassi's departure." Hospital Defendants' Brief p. 46. The report, however, was not based on a discrete act three years after Bassi's departure, but was in response to complaints in 2019 and addressed Harkisoon's overall management of the Program. Furthermore, the report is not testimony by a third party witness about a particular act, but the Program's own conclusion as to how Harkisoon ran the Program, as well as their own conclusion that Harkisoon "lacked honesty and was often not forthcoming." SA-32.

Those conclusions are corroborated by the testimony of residents and faculty about retaliatory conduct in the Program during Bassi's residency. Kaul testified that Harkisoon threatened to ruin her career in family medicine if Kaul left the Program. JA-1488. After this threat, Open Door confirmed to Kaul that many of their staff had complained about Harkisoon's bullying behavior. *Id.* Two Core Faculty members, Andron and Puthiyamadam, acknowledged that residents expressed fear of speaking out due to retaliation by Harkisoon. JA 1429 163:18-165:24, 1432 37:3-12. One of them, Andron, eventually found herself on the receiving end of Harkisoon's wrath and left the Program because Harkisoon refused to accommodate her request to work from home after she was involved in a severe automobile accident. JA-1432 35:14-36:17. Another Core Faculty member, when speaking with Phelps's investigators, was so afraid of retaliation by Harkisoon that she asked to conduct her interview by phone to avoid being seen at the human

resources office. SA-29. Two residents declared that they were pressured by Harkisoon to provide only positive feedback on ACGME surveys, JA-1493, 1502. That is consistent with the Program's own findings that Harkisoon pressured such students to do so. SA-24-36. A third resident averred that he and other residents were reluctant to raise any criticisms of the Program because he saw how Bassi was treated after he had raised his complaints. JA-1499.

The Program's own conclusions are not simply based on events remote from Bassi's own experience in the Program. Rather, they are congruent with what Bassi, other residents, and other faculty all experienced during the time period of Bassi's residency. The evidence is probative and admissible.

## D. Comments Regarding Bassi's Patka And His Complaint Against The Core Faculty Are Probative.

Appellees take the most innocuous version concerning the remarks about Bassi wearing his patka, claiming it was made not by the Core Faculty but by a hospital faculty member, and that it played no role in the evaluation of Bassi's performance. On a motion for summary judgment, however, the Court (and the parties) must adopt the interpretation of events most favorable to the non-movant. As stated in Appellant's Brief, there are multiple sources of evidence from which a reasonable jury could reject Appellees' explanation.

Bassi was initially informed by the two Chief Residents that the Core Faculty had made the comments, and explicitly tied it to his performance. JA-1241-1242

15

¶¶13-16.  Puthiyamadam confirmed to Bassi that the comments were made in a faculty meeting.  JA-1375 166:21-167:3.  Puthiyamadam testified that "some of the specialists" and more generally "some people" had mentioned Bassi's patka. JA-1422.  Kaul testified that as early as Bassi's first year, Harkisoon had derided Bassi as looking like a "thug" when he wore his patka.  JA-1485-1486 ¶¶6-8.  Appellees also did not submit a declaration from the hospital faculty member to who they attribute the statement.

The Hospital Defendants also claim that the evidence is not relevant because "Such comments do not speak at all to Bassi's academic or clinical performance." This argument turns *McDonnell-Douglas* and its progeny on their heads.  As noted in Point II.B *supra*, a plaintiff may respond to the employer's proffered nondiscriminatory reason by either proving that discrimination was more likely than not the real reason, or that the employer's proffered reason is unworthy of credence. The statements that Bassi looked like a "thug" and "unprofessional" in his patka are proof of discriminatory animus regardless of the Appellees' proffered reasons for their actions, and a reasonable jury could use that evidence (along with the other evidence submitted by Bassi) that discrimination, rather than performance, was the real reason for refusing to allow Bassi to complete the residency. Appellees attempt to exclude proof of discrimination by claiming that once they have proffered their

16

legitimate non-discriminatory reason, Bassi is limited to <u>only</u> submitting evidence concerning his performance. *Burdine* holds otherwise.

Similarly, Puthiyamadam's comment to Bassi that "You just made matters worse for yourself" when he advised her of his complaint against the Core Faculty is similarly probative of retaliation. The Hospital Defendants argue that when Puthiyamadam testified she "did not recall" making the remark that she actually was denying that she made it. Hospital Defendants Brief p. 40. That is contradicted by her own testimony. When asked to clarify if she denied making the statement, or did not recall whether she made it, she explicitly said that she did not recall, and did not deny that she may have said it. JA-1425 46:17- 47:4. In any event, even if Puthiyamadam flatly denied making the statement, Bassi has testified that she did, and that is a disputed issue of fact precluding summary judgment.[3]

---

[3] Contrary to the Hospital Defendants representation at page 40 of their Brief, members of the Core Faculty/CCC were aware of the complaint. The Record shows that Puthiyamadam, Collins, and Paul all were aware. JA-763, 1423-1424 and Harkisoon advised the Core Faculty that she would not precept Bassi because "I was accused of prejudice" JA-1306. In fact, Harkisoon continued to precept Bassi after he made his complaint in January of 2016. JA-686, 703.

## POINT IV.

## BASSI IS ENTITLED TO SUMMARY JUDGMENT
## ON HIS CLAIM FOR BREACH OF CONTRACT

Bassi's breach of contract claim does not question the academic judgment of the Program. Rather it seeks the benefit of it. The academic judgment in this case was made by the faculty members that passed Bassi in his rotations, and by the Appeals Committee that overturned the decision to not promote him and remove him from the residency.   It is Appellees, not Bassi, who are disregarding relevant academic judgment by improperly withholding credit that faculty determined he has earned, and further by failing to implement the decision of the Appeals Committee, instead requiring him to repeat his PGY-2 year for a third time and supervising him with the same faculty whose decision was overturned by the Appeals Committee, adding a four month probationary period.

### A.  Appellees Misstate Both The Ruling of The Appeals Committee And The Program's Guidelines For Awarding Credit For Rotations

Appellees allege that the 2017 decision of the Appeals Committee ruled only that Bassi should be reinstated into the Program, and made no determination as to whether he had progressed to PGY-3.  Appellees do this by quoting one sentence stating "…no new information was presented [to] warrant the committee's departure from its prior decision to reinstate Dr. Bassi."

As noted in pp. 52-54 of Appellant's Brief, this reading of the 2017 decision ignores both the remainder of the decision as well as what was being appealed. Appellees interpretation of the decision ignores:

- The language stating "Dr. Bassi has demonstrated sufficient competency in numerous venues so as to countervail the issues that previously arose."

- The Appeals Committee highlighting one piece of evidence (Bassi's score on the National In Training Examination) and noting that it "occurred following the committee's prior decision," further underscoring that the 2017 decision was in contrast with the 2016 decision.

- The Appeals Committee did not just order Bassi's reinstatement, but that he should also "be allowed to complete any outstanding rotations to finish his training."

- After receipt of the Appeals Committee decision, NYMC's counsel responded to the committee and confirmed that they would hire a new attending physician "to supervise Dr. Bassi for his remaining rotations." He said nothing to the Appeals Committee about requiring Bassi to repeat PGY-2 a third time or that those rotations would include those he had already completed.  JA-748.

- The prior 2016 decision, even when upholding the decision to require Bassi to complete PGY-2, ordered that he receive credit for already completed work.[4]

- Both the former chair of the GMEC and his successor confirmed that the 2017 decision meant Bassi had to complete his remaining rotations, not repeat the PGY-2 year.  JA-1071, JA-1458.

---

[4] Although Bassi technically repeated PGY-2, he worked in PGY-3 rotations. Under the Program's unsupportable interpretation of both Program guidelines and the 2017 Appeals Committee decision, they were entitled not only to require him to repeat PGY-2 for a third time, but have him placed even further back than when he repeated PGY-2 the second time, when the Appeals Committee upheld the non-promotion.

Appellees interpretation is further belied by the nature of the appeal. Appellees attempted to terminate Bassi's residency on the ground that he had not met the milestones for promotion to PGY-3. JA-738 ("The CCC determined that Dr. Bassi has not met remediation requirements and cannot be promoted to PGY-3."). In rejecting the Program's decision to terminate Bassi, the Appeals Committee by necessity rejected the CCC's rationale for termination, that Bassi had not demonstrated competency to advance in the Program.

Appellees nevertheless claim that Bassi's remedy would have been to file a third appeal with a new Appeals Committee. There is no such requirement. Bassi presented his case to the Appeals Committee, and the Appeals Committee found him competent to not only be promoted to PGY-3, but ready to complete the residency entirely once he completed any outstanding rotations. A third appeal would not review any academic determinations regarding placement, because those determinations had already been made in his favor. The rotation faculty who had reviewed Bassi's performance all stated that he had met the requirements to complete the rotation, and the 2017 decision rejected the assessment by Harkisoon and the CCC that Bassi had not demonstrated such competency.

Appellees also misinterpret or just ignore Program guidelines and procedures when they insist that there is no such thing as credit for work successfully performed. Appellees offer no evidence for this other than their own say-so, and it is

contradicted by all other sources of evidence, including from some of Appellees own

witnesses. This includes:

- The Resident Handbook sets forth standards for what is needed to receive credit for a rotation. Just as important, it also describes the remedial procedure if the resident has <u>not</u> received credit for a rotation. The resident must be promptly informed that they have not passed and given appropriate remedial work so they can complete the rotation. JA-963-964.

- The Appeals Committee guidelines explicitly allow appeals for credit from a rotation. JA-968.

- The 2016 Appeals committee decision stated that while Bassi should repeat his PGY-2 year, he should receive "credit provided for work successfully completed." JA-969.

- The former chair of the Program's GMEC confirmed the residency has standards for granting credit for rotations, remedial measures in case a resident fails to pass a rotation, and that the Program failed to follow such standards in Bassi's case. JA-1071

- Karen Murray, the subsequent chair of the GMEC, justified making Bassi repeat PGY-2 a third time on the erroneous belief that he had not successfully completed his rotations. JA-990-991.

- At least one member of the Core Faculty and CCC recognized that Harkisoon's plan to deny Bassi all credit for both PGY-2 years was not proper as she acknowledged that Bassi "passed various rotations" and that "the CCC doesn't evaluate other rotations." JA-1323.[5]

---

[5] These emails also show that the decision to deny Bassi any credit for both PGY-2 years was made by Harkisoon and the Core Faculty when they intended to terminate Bassi's residency, and Harkisoon's response is not based on Bassi's performance in the rotations or any performance at all, but based on the assumption that he would have to serve two full years at any program to which he transferred based on the American Board of Family Medicine's requirement that a resident spend the final two years of a residency in the same program. Thus, Appellees made no bona fide academic determination as to Bassi's competency,

Appellees claim that the residency doesn't offer credit, and that placement is based on a "holistic" review of the resident's progress are contradicted by the Program guidelines, by the appeals guidelines, by the two Chairs of the Program's GMEC, the Appeals Committee's decision, and the admission of a Core Faculty/CCC member that Bassi passed his rotations and that the CCC had no role in determining whether he did.

## B. Bassi Failed To Receive Timely Notice And Due Process

The Hospital Defendants claim that they did not breach the notice provisions of the Resident Handbook incorporated into the Residency Agreement because Bassi received notice that he might not be promoted when he was placed on an academic action plan. (Hospital Defendant's Brief p. 51). The relevant portions of the handbook do not require notice that a resident might not be promoted, but that a resident will not be promoted. JA-962.

Requiring timely notice of non-promotion is not "contrary to the nature of the academic Program." If a Resident fails to demonstrate competency after February 1 of the relevant academic year, the Program does not have to promote them, but it requires a vote of the GMEC to deny promotion. *Id.* The Hospital Defendants then say that "Bassi's non-renewal was presented to the GMEC." Hospital Defendants

---

but simply denied him credit under the assumption that he would be leaving the Program and starting anew elsewhere. JA-1323.

Brief p. 51. The minutes of the GMEC meetings show that Harkisoon generally discussed one resident who was "on remediation," but did not allow the GMEC to vote on the manner. Indeed, the former chair of the GMEC expressed concern that due process was not being followed, and confirms that the GMEC did not have the opportunity to vote on non-promotion as required by the Resident Handbook. JA-1070-1071.

The Resident Contract also promises that a resident will receive due process in any appeals process. Here, the Record demonstrates that NYMC interfered in the deliberations of the Appeals Committee, causing them to change their decision.

## POINT V.

## BASSI HAS PRESENTED EVIDENCE
## IN SUPPORT OF CONSTRUCTIVE DISCHARGE

Appellees claim that Bassi has "waived" or "abandoned" various arguments. This is incorrect. The lower court's decision ruled that there was no evidence of discrimination or retaliation, and no claim for breach of contract. It therefore did not reach issues raised by Appellees in their briefs, including but not limited to a) whether the treatment of Bassi rose to the level of a constructive discharge, b) whether NYMC was a party to the contract, c) whether NYMC was an "employer" in the Program, or d) whether Harkisoon is individually liable under the NYSHRL. The proper course in addressing an argument not necessarily decided by the lower court is to allow the matter to be addressed on remand. *Morrison v. Johnson*, 429

F.3d 48, 52 (2d Cir. 2005). If Appellees have raised any alternative arguments for affirmance, Bassi is entitled to respond to them in reply. *United States v. Bari*, 599 F.3d 176, 180 n.6 (2d Cir. 2010); *United States v. Brown,* 348 F.3d 1200, 1213 (10th Cir. 2003) ("When an appellee raises in its answer brief an alternative ground for affirmance, the appellant is entitled to respond in its reply brief.").

Bassi has not "abandoned" a claim for constructive discharge. Appellant addressed Appellees' arguments in his opposition brief at pp. 34-37 (Docket Entry 132), and because the court ruled that there were no unlawful acts of discrimination, retaliation or breach of contract, there was no holding as to whether those acts amount to constructive discharge. In addition, the Hospital Defendants only raised an argument that Bassi was not constructively discharged in seeking to dismiss his breach of contract claim. Hospital Defendants' Brief p. 23 (Docket Entry 117). The Hospital Defendants now repurpose their arguments for the first time to claim that any complained of acts do not rise to the level of constructive discharge for purposes of Dr. Bassi's discrimination and retaliation claims.

"'Constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily. Working conditions are intolerable if they are so difficult or unpleasant that a reasonable person in the

employee's shoes would have felt compelled to resign.'" *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 73 (2d Cir. 2000).

"Because the standard for constructive discharge requires a determination of how a reasonable person would behave 'in the employee's shoes,' *Pena v. Brattleboro Retreat*, 702 F.2d 322, 325 (2d Cir. 1983)], 'the issue of whether a constructive discharge has occurred should generally be left to the trier of fact.'" *Halbrook v. Reichhold Chemicals, Inc.*, 735 F. Supp. 121, 125 (S.D.N.Y. 1990). In evaluating an employee's constructive discharge claim, the court does not consider the discriminatory and retaliatory acts separately, but as a whole. *Halbrook*, 735 F. Supp. at 128

Bassi was subjected to three years of discriminatory, retaliatory, and harassing treatment, which he reported to the Program as early as PGY-1. Bassi and other residents sought to relay their concerns about the Program to NYMC's designated institutional officer, but were told by him that he would disclose their names to Harkisoon if they made the complaint. JA-1487 ¶11. During PGY-2, Bassi complained of the disparaging treatment that he received for wearing headwear prescribed by his faith. Afterwards, Bassi was subjected to an escalated campaign of retaliation with the goal of removing him from the Program. Andron told Kaul as early as Bassi's first PGY-2 year that they were trying to "get rid" of Bassi. JA-1486-1487 ¶9. The Program failed to promote Bassi to PGY-3 and attempted to

terminate him before he could complete his repeat of PGY-2, a decision that was overturned by the Appeals Committee in 2016.  JA-969.

In June 2017, Harkisoon and the CCC formally terminated Bassi (for a second time).  Bassi again appealed, and although his appeal was successful, he was required to repeat the entire PGY-2 year based on a falsified transcript prepared by Harkisoon and the Core Faculty, knowing they were denying Bassi credit for rotations that he had successfully passed.  Bassi was also required to return on probation and, in the Open Door clinic, he was to be observed by the same Core Faculty that had been engaged in discriminatory and retaliatory treatment of him over the past three years.

Bassi tried to go through the Appellees' internal processes, such as the PGY-1 survey, his complaints to Phelps and Open Door, his attempt to complain to NYMC, and the appeals process.  Despite playing by the rules, he continued to be subjected to discriminatory and retaliatory treatment.  No reasonable person would remain in such a position only to go through the same process yet another year.

Furthermore, a fact finder need not speculate what a "reasonable person" would do in Bassi's circumstances because the Record shows what reasonable people did under similar circumstances.  After observing mistreatment of residents, being threatened by Harkisoon, and confirmation by Open Door that Harkisoon had bullied their staff, Kaul resigned from the Program.  JA-1488.  Andron resigned from the Program due to disagreements with Harkisoon and Harkisson's refusal to

26

accommodate a need to work certain days from home after an accident.  JA-1432 -

35:18-36:15.   Core Faculty members Andron and Puthiyamadam, testified that

residents were concerned about retaliation.  JA-1432 – 37:3-12; JA-163:18 – 164:7.

The Program ultimately acknowledged such abusive conduct.  SA-39.

Bassi, who was in the cross-hairs of Harkisoon and the Core Faculty/CCC for

reporting discriminatory and retaliatory conduct, has demonstrated conduct that,

when taken as a whole, would allow a jury to determine that he was constructively

discharged.

## POINT VI.

## BASSI HAS ASSERTED CLAIMS AGAINST NYMC AS AN EMPLOYER AND AS A PARTY TO THE CONTRACT.

Bassi has not waived any claims against NYMC. The lower Court dismissed

the claims on the ground that a) there was no discrimination or retaliation by

Appellees and that b) there was no breach of contract. NYMC's claims that it was

not an employer, not a party to the contract, and did not tortiously interfere with that

contract were not addressed by the lower Court.  Bassi nevertheless addressed these

issues in his briefs below.  Plaintiff's Opposition Brief, Docket Entry pp. 131 37-39;

Plaintiff's Reply Brief, Docket Entry 141, pp. 13-14.

Title VII, state, and local discrimination laws recognize the 'joint employer'

doctrine.  *Arculeo v. On-Site Sales & Marketing*, LLC, 425 F.3d 193, 197-98 (2d Cir.

2005).  The joint employer doctrine "'assumes that [there] are separate legal entities,

but that [the entities] handle certain aspects of their employer-employee relationship jointly.' *Echevarria v. Insight Med., P.C.*, 72 F. Supp. 3d 442 (SDNY 2014). Under the joint employment doctrine, "liability may be found when 'separate legal entities have chosen to handle certain aspects of their employer-employee relationships jointly.'" Id. at 459. Under this doctrine, where an employee is formally employed by one entity, liability for a violation of employment law may be imposed on another entity where circumstances justify a conclusion that the employee is at the same time constructively employed by the other entity as a joint employer. *Echevarria*, 72 F. Supp. 3d at 459 (*citing Arculeo*, supra, 425 F.3d at 198).

NYMC is liable as a joint employer. Phelps, NYMC (subsequently replaced by Northwell), and Open Door jointly oversaw and were jointly responsible for the Program. NYMC's Dean appointed Harkisoon as Program Director, JA-1449,16:2-4, and Harkisoon was supervised by and reported to the Chief Medical Officer of Phelps, Chief Medical Officer of Open Door, and Designated Institutional Officer of NYMC. JA-1406 18:5-19:23, 20:12-14.

NYMC argues that it was not involved in any of the complained of acts and therefore not liable. As noted above, if an entity is liable as an employer under the joint employment doctrine, it is liable for any acts as an employer whether or not it engaged in the specific complained of conduct. Nevertheless, NYMC cannot disclaim responsibility for the complained of acts in this case. NYMC was

28

responsible for determining a resident's standing in the Program, JA-1256 ¶¶67-68, JA-1356-1358, and the CCC consults with NYMC regarding decisions concerning residents. JA-1406-1407 21:8-22:9. Indeed, the CCC acted on behalf of all parties to the Program, i.e., Phelps, NYMC, and Open Door. JA-1407 23:8-24. NYMC prepared the guidelines for the appeals process, JA-1412 104:17-105:2, and in an ex parte communication with the Appeals Committee, NYMC's counsel asked them to modify or even entirely reverse its decision. JA-984. NYMC is therefore an "employer" for purposes of NYSHRL and Title VII violations. It's involvement in the Residency Program, including areas explicitly delineated in the affiliation agreements, also make it a party to the Residency Contract.

In the alternative, if NYMC is found not to be a party to the contract, it can still be held liable for tortious interference with contract. As noted above, NYMC directly involved itself in Bassi's appeal (and was responsible for same under the Affiliation Agreement), and its attorney, through ex parte contact with the Appeals Committee, changed the terms of the Appeals Committee decision.

## **<u>CONCLUSION</u>**

For the aforementioned reasons, Bassi respectfully requests that the lower court's decision be reversed in its entirety, and that this Court direct the lower court to deny Appellees' motion for summary judgment and grant Bassi's motion for partial summary judgment on his claim for breach of contract.

Dated: September 28, 2023
     New York, NY

                         LAW OFFICES OF JOSHUA PARKHURST
                         By:  */s/ Joshua Parkhurst*
                         Joshua Parkhurst
                         11 Broadway, Suite 615
                         New York, NY  10004

## <u>CERTIFICATE OF COMPLIANCE</u>

1.     This brief complies with the type-volume limitation of Fed R. App. P 28(1)(e)(2)(A) and Local Rule 32.1(a)(4)(B) because this brief contains 6,912 words, excluding the parts of the brief exempted by Fed R. App. P. 32(f).

2.     This brief complies with the typeface requirements of Fed R. App. P. 32(a)(5) and type style requirements of Fed R. App. P. 32(a)(5) and type style requirements of Fed R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14 Point Times New Roman.

Dated:  September 28, 2023
           New York, NY

                              LAW OFFICES OF JOSHUA PARKHURST
                              By:    */s/ Joshua Parkhurst*
                              Joshua Parkhurst
                              11 Broadway, Suite 615
                              New York, NY  10004